594 S.E.2d 867

**Joseph Michael AUSTIN and Sandra Austin, Respondents,**

v.

**SPECIALTY TRANSPORTATION SERVICES, INC., Appellant.**

No. 3768.

Court of Appeals of South Carolina.

Submitted March 8, 2004.

Decided March 29, 2004.

302

A. Todd Darwin, of Spartanburg, for Appellant.

Gene Adams and Robert E. Davis, of Spartanburg, for Respondents.

ANDERSON, J.:

Joseph Michael Austin and Sandra Austin (collectively, "Respondents") brought an action against Specialty Transportation Services, Inc. (Appellant) and its employee, Walter Ray Bishop, in connection with an automobile accident. Respondents obtained an entry of default against Bishop and Appellant.[1] The trial court awarded actual and punitive damages to Respondents. We affirm.[2]

## FACTUAL/PROCEDURAL BACKGROUND

On November 18, 1999, Respondents were seriously injured in an automobile accident when a tractor-trailer truck driven by Appellant's employee hit their vehicle. Respondents were traveling south on U.S. 29, and the truck was approaching U.S. 29 from an Interstate 85 exit ramp. A stop sign controlled the truck's lane of traffic. However, the driver of the truck failed to yield the right of way to Respondents' vehicle. The truck entered U.S. 29 and struck Respondents' vehicle.

Joseph was trapped in the vehicle for more than an hour. While Joseph was in the car, he was in tremendous pain, his leg was broken in such a way that it was resting between his left shoulder and cheek, and he feared he would burn to death. Joseph sustained injuries to his lower back, neck, right shoulder, right elbow, right leg, and right ankle. Joseph was hospitalized until December 1, 1999. During his hospitalization, Joseph had surgeries on his leg and received counseling for depression. Joseph underwent two additional surgeries after his release from the hospital and endured painful rehabilitation. Joseph described his injuries and resulting pain, including how they have altered his life:

---

1. Respondents later voluntarily dismissed their claims against Bishop.

2. We decide this case without oral argument pursuant to Rule 215, SCACR.

[Respondents' Counsel]: Did you have immediate problems in all of those areas [right knee, right leg, neck, hands, and fingers] after the accident on November 18, 1999?

[Joseph]: The leg was very evident that it was broken, and I had again a long period of that. I complained fairly early about my neck but everybody seemed to be more concerned about the leg healing and basically being bedridden. I wasn't using my arm so I assumed that back problem or the neck problem wasn't really apparent.

. . . .

[Respondents' Counsel]: Now, Joe what was the state of your fitness prior to the accident? Did you exercise regularly, walk, jog and things like that?

[Joseph]: Yes. My download, or my basically the way I—instead of other people have different ways of relieving stress. My stress reliever is to walk behind our house. We had a place about a mile and a half down to a dam, on your way you visit like hanging rock and then down to the dam, then you cross the river and then you basically backtrack a different trial [sic], which the about the same length, that was a daily ritual. Cutting the grass, cutting the bushes, pretty much—we built a deck on the back of our house, me and Sandra. We decided we wanted a deck so we built a deck.

Anything I wanted to do. We were going every weekend. If we wanted to go somewhere we would pack the car and just go. Jonathan was in the Grand Canyon at eight months. It just all changed.

[Respondents' Counsel]: Joe, have you made that walk down to the river since the accident occurred?

[Joseph]: No, sir.

[Respondents' Counsel]: Can you make that walk now?

[Joseph]: No, sir.

. . . .

[Respondents' Counsel]: When you came to [after the accident], Joe, what configuration were you in?

[Joseph]: Well, I was laying kind of over and I was looking basically at the sole of my shoe of my right leg and I was wondering, "Well, how in the heck was that there."

[Respondents' Counsel]: Where was that? Show the Judge with your hand.

[Joseph]: Basically, it was laying kind of here.

[Respondents' Counsel]: You're showing on your left shoulder between your left shoulder and your cheek.

[Joseph]: Yes, sir.

[Respondents' Counsel]: Were you able to move as if to get out of the car?

[Joseph]: No. Because the door had pressed in on me, and all I could see was my foot and what I thought was blood everywhere, it was coffee from my wife's coffee. And all of the sudden this blue flame shot in and smoke started rolling in and I looked at my wife and told her to get away from the car.

[Respondents' Counsel]: What were your thoughts when the blue flame rolled through?

[Joseph]: I thought I was going to burn to death.

. . . .

[Respondents' Counsel]: What goes through your mind? What went through your mind?

[Joseph]: It's just a lot of pain, discomfort, question and confusion what's happened. At time an EMS person hops in the back seat and they start basically taking my clothes off with the scissors and stabbing me with a needle. Again, it was—I was trying to get out with the good leg but the good leg was actually trapped underneath the console of the car and this leg just over here.

. . . .

[Respondents' Counsel]: . . . Were you on any pain medication? When did you first receive pain medication if you know?

[Joseph]: . . . And I remember a doctor [in the Emergency Room] saying, "Son, can I take a look at that leg please?"

And I let go and he basically pulled it out and I must have passed out from the pain because when I woke back up they were still doing similar things. I was trembling, it was cold and they wouldn't get me any medication because they thought I had internal bleeding.

. . . .

[Respondents' Counsel]: Tell us about your neck and back, Joe. What problems do you have with your neck and arm?

[Joseph]: Basically, it stiffens up. Like the tingles in the hands, if I drive long distances with arms elevated basically I lose my grip capability, ability of gripping or stiff gripping. I can still grip like if the object is as big as this I can grab it but if it's as small as a steering wheel on my car it's hard.

[Respondents' Counsel]: Do you have pain in your neck and back?

[Joseph]: Yes, sir, there's pain. That's kind of become a thing that you have everyday. When you get up in the morning it's either the leg, it's the foot, it's the back it's the beck [sic], it's the arms, it's the fingers.

. . . .

[Respondents' Counsel]: And are you in pain on a daily basis in your leg?

[Joseph]: Yes, sir, neck and pack [sic].

Joseph's orthopedic surgeon, Dr. Michael Wayne Funderburk, estimates Joseph will require surgery on his knee every two to five years for the remainder of his life. Dr. Funderburk assessed a forty percent permanent impairment to Joseph's lower right extremity. Joseph has $170,010.62 in present and future medical bills. At trial, Dr. Funderburk discussed Joseph's present and future condition:

[Respondents' Counsel]: All right, sir. Tell us about his course of recovery after that, Doctor.

[Funderburk]: Well, he's done very well for this fracture in my opinion. He certainly has a painful situation as far as his kneecap, and this is because of extensive muscle trauma as well as the damage to the inside of the knee. There's a lot of scarring and limited mobility over that segment, which worsens the arthritic problem underneath that kneecap because there's so much tethering from the muscle damage and the damage to the kneecap proper.

We have subsequently performed arthroscopy surgery and debridement of this, with some benefit. I think that this is going to be a progressive problem for him unfortunately.

[Respondents' Counsel]: Well, will he require, in your professional judgment, debridement surgery in the future for that knee?

[Funderburk]: Yes, I do believe he will.

[Respondents' Counsel]: How often will he require that in your judgement, Doctor?

[Funderburk]: You know, I think that as the arthritis and as the debris within the knee builds up he may need this every two years to clean the knee out. The only other option you have is to replace the knee. And I think in someone this age you would hope that you could use conservative means to try to keep this knee as long as you could before you performed a replacement type surgery on him.

[Respondents' Counsel]: This condition that he has in the knee underneath the kneecap, is that a painful condition?

[Funderburk]: It is.

. . . .

[Respondents' Counsel]: Okay. Tell us about—you said [Joe has] pain in the neck and also some tingling or pain into the hands. Tell us what that comes from.

[Funderburk]: Well, anytime there's swelling or problems around the neck from degenerative changes or disk problems there can be neurological symptoms or nerve pain down into the hands with numbness being one of the common findings into the arms from the neck.

[Respondents' Counsel]: Okay. Are these permanent conditions?

[Funderburk]: They are. They can be progressive conditions that can worsen.

[Respondents' Counsel]: Is it fair to say they're not going to get any better?

[Funderburk]: I don't believe they are.

[Respondents' Counsel]: Okay. Now Doctor, do you believe that Joe has sustained a permanent injury to his leg—his lower right extremity?

[Funderburk]: Yes, sir.

[Respondents' Counsel]: Do you have an opinion as to the percent disability he sustained to his lower right extremity?

[Funderburk]: I've rated him at forty percent permanent impairment to this extremity.

[Respondents' Counsel]: And that rating is based upon what consideration?

[Funderburk]: That rating is based upon the consideration on limitation of motion, the arthritis I know is going to occur within this knee as well as the limitation of motion and pain in the right foot as well. I felt that with the progressive problems within the right knee as well as the permanency to the right foot that this was a rating that I gave to his leg.

Sandra suffered injuries to her breast, right hand, and neck. She incurred $57,460.58 in liquidated actual damages. Sandra detailed her injuries:

Basically I had a large bruise over my left breast. I ended up having, just from the force of the accident, issues with my right hand. It made it hard to pick up things, I broke dishes, cookware, that kind of thing, and just issues with fine detail. I had trouble—actually when they asked me to sign the informed consent I was hurting signing the informed consent. I had difficulty holding the pen to do, that kind, plus I had some issues in the neck.

Sandra, who is a registered nurse, cared for Joseph twenty-four hours a day for many months. During this time, Sandra missed work and lost several bonuses. Sandra enunciated:

[Respondents' Counsel]: In addition to the fact that you were under medical treatment, was there any other reason you had to be home during that period of time?

[Sandra]: Yes. Part of the stipulation for Joe's dismissal at the hospital was that I would not work and be there for twenty-four hour care giver [sic]. That was the agreement that we made with the physician to discharge my husband.

[Respondents' Counsel]: When Joe was discharged from the hospital, was he discharged bedridden?

[Sandra]: Yes, sir.

[Respondents' Counsel]: Was he discharged in traction?

[Sandra]: Yes, sir.

[Respondents' Counsel]: Was that twenty-four hours a day?

[Sandra]: Yes, sir.

[Respondents' Counsel]: Was Joe able to get out of bed?

[Sandra]: No, sir.

[Respondents' Counsel]: Was Joe able to go to the bathroom?

[Sandra]: No, sir.

[Respondents' Counsel]: Was Joe even able to use a potty seat?

[Sandra]: No, sir.

[Respondents' Counsel]: Did you have to do all of that for him?

[Sandra]: Yes, sir.

Sandra testified the accident has substantially changed her family's lives:

[Respondents' Counsel]: Now, how is Joe doing now, Sandra?

[Sandra]: We learn to live with it. He's still depressed. He's not the same guy fourteen years ago.

On February 11, 2002, Respondents obtained an entry of default against the driver of the truck and Appellant. After a combined hearing on the issues of relief from default and damages, the trial court denied Appellant's motion for relief from default and awarded actual and punitive damages to Respondents. The trial judge awarded Joseph $850,000 in actual damages and $2,158,000 in punitive damages. He awarded Sandra $175,000 in actual damages and $442,000 in punitive damages. Appellant filed a motion to alter or amend the judgment. In response, Respondents filed a motion to open the judgment. The trial court denied Appellant's motion and granted Respondents' motion.

## STANDARD OF REVIEW

■■ The trial judge has considerable discretion regarding the amount of damages, both actual or punitive. *Collins Entm't Corp. v. Coats & Coats Rental Amusement*, 355 S.C. 125, 584 S.E.2d 120 (Ct.App.2003); *Kuznik v. Bees Ferry Assocs.*, 342 S.C. 579, 538 S.E.2d 15 (Ct.App.2000). Because of this discretion, our review on appeal is limited to the correction of errors of law. *Kuznik*, 342 S.C. at 611, 538 S.E.2d at 32; *Welch v. Epstein*, 342 S.C. 279, 536 S.E.2d 408

(Ct.App.2000). Our task in reviewing a damages award is not to weigh the evidence, but to determine if there is any evidence to support the damages award. *See Hutson v. Cummins Carolinas, Inc.,* 280 S.C. 552, 314 S.E.2d 19 (Ct. App.1984).

## *LAW/ANALYSIS*

## I. AMOUNT OF DAMAGE AWARDS

Appellant argues the evidence in the record does not support the trial court's excessive damage awards to Respondents. We review the damage awards separately and distinctly.

### A. Actual Damages

Being mindful of the standard of review in the present case, which does not require this Court to weigh the evidence, but merely determine if there is any evidence to support the damage awards, we find the amounts of actual damages awarded to Joseph and Sandra were proper. *See Hutson v. Cummins Carolinas, Inc.,* 280 S.C. 552, 314 S.E.2d 19 (Ct.App.1984).

Actual damages are properly called compensatory damages, meaning to compensate, to make the injured party whole, to put him in the same position he was in prior to the damages received insofar as this is monetarily possible. *See Clark v. Cantrell,* 339 S.C. 369, 529 S.E.2d 528 (2000). Actual damages are awarded to a litigant in compensation for his actual loss or injury. *Laird v. Nationwide Ins. Co.,* 243 S.C. 388, 134 S.E.2d 206 (1964). Actual damages are such as will compensate the party for injuries suffered or losses sustained. *Id.* They are such damages as will simply make good or replace the loss caused by the wrong or injury. Actual damages are damages in satisfaction of, or in recompense for, loss or injury sustained. *Barnwell v. Barber–Colman Co.,* 301 S.C. 534, 393 S.E.2d 162 (1989). The goal is to restore the injured party, as nearly as possible through the payment of money, to the same position he was in before the wrongful injury occurred. *Clark,* 339 S.C. at 378, 529 S.E.2d at 533.

Actual or compensatory damages include compensation for all injuries which are naturally the proximate result of the alleged wrongful conduct of the defendant. *See Rogers v. Florence Printing Co.*, 233 S.C. 567, 106 S.E.2d 258 (1958). The basic measure of actual damages is the amount needed to compensate the plaintiff for the losses proximately caused by the defendant's wrong so that the plaintiff will be in the same position he would have been in if there had been no wrongful injury. *See Rogers*, 233 S.C. at 578, 106 S.E.2d at 264; *Hutchison v. Town of Summerville*, 66 S.C. 442, 45 S.E. 8 (1903).

The trial court awarded $850,000 in actual damages to Joseph. Joseph presented uncontested evidence of a total of $170,010.62 in present and future medical bills. He testified as to his extreme pain and suffering, impaired ability to work, and loss of enjoyment of life. Joseph underwent four surgeries and is expected to receive surgery every two years for the remainder of his life. In addition, his doctor rated Joseph as having a forty percent permanent impairment to his lower right extremity.

The trial court awarded $175,000 in actual damages to Sandra. Sandra presented uncontested evidence of $57,460.58 in liquidated actual damages. She testified as to the leave she took from her job as a registered nurse in order to care for Joseph twenty-four hours a day for many months.

We find Joseph and Sandra presented sufficient evidence to support the trial court's actual damage awards.

### B. Propriety of Punitive Damages

Appellant contends the trial court erred in awarding any punitive damages, as they were not supported by the record and are based on improper considerations. We disagree.

Punitive damages, also known as exemplary damages, are imposed as punishment. *Clark v. Cantrell*, 339 S.C. 369, 529 S.E.2d 528 (2000). Punitive damages are allowed in the interest of society in the nature of punishment and as a warning and example to deter the wrongdoer and others from committing like offenses in the future. *Id.* Moreover, they

serve to vindicate a private right by requiring the wrongdoer to pay money to the injured party. *Id.*

 Punitive damages serve at least three important purposes: (1) punishment of the defendant's reckless, willful, wanton, or malicious conduct; (2) deterrence of similar future conduct by the defendant or others; and (3) compensation for the reckless or willful invasion of the plaintiff's private rights. *Id.* The paramount purpose for awarding punitive damages is not to compensate the plaintiff but to punish and set an example for others.

 On the issue of punitive damages, the highest burden of proof known to the civil law is applicable. Section 15–33–135 of the South Carolina Code provides:

> In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence.

S.C.Code Ann. § 15–33–135 (Supp.2003). Punitive damages can only be awarded where the plaintiff proves by clear and convincing evidence the defendant's misconduct was willful, wanton, or in reckless disregard of the plaintiff's rights. *Taylor v. Medenica,* 324 S.C. 200, 479 S.E.2d 35 (1996); *Lister v. NationsBank of Delaware,* 329 S.C. 133, 494 S.E.2d 449 (Ct.App.1997).

 There is no formula or standard that can be used as a measure for assessing punitive damages. However, factors relevant to consideration of punitive damages are:

(1) the character of the defendant's acts;

(2) the nature and extent of the harm to plaintiff which defendant caused or intended to cause;

(3) defendant's degree of culpability;

(4) the punishment that should be imposed;

(5) duration of the conduct;

(6) defendant's awareness or concealment;

(7) the existence of similar past conduct;

(8) likelihood the award will deter the defendant or others from like conduct;

(9) whether the award is reasonably related to the harm likely to result from such conduct; and

(10) defendant's wealth or ability to pay.

*See Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991); *see also Welch v. Epstein,* 342 S.C. 279, 306, 536 S.E.2d 408, 422 (Ct.App.2000) ("Under *Gamble,* the trial court is not required to make findings of fact for each factor to uphold a punitive damage award.").

 This Court must affirm the trial court's punitive damages finding for the Respondents if any evidence reasonably supports the judge's factual findings. *See Carjow, LLC v. Simmons,* 349 S.C. 514, 563 S.E.2d 359 (Ct.App.2002). A factual question as to punitive damages is presented when there is evidence of a statutory violation. *See Wise v. Broadway,* 315 S.C. 273, 433 S.E.2d 857 (1993).

 The trial court found Appellant's agent violated S.C.Code Ann. §§ 56–5–2330(b) [3] and –2740 [4] (1991) by failing to stop and yield the right of way to Respondents' vehicle. The evidence in the record, which shows Appellant's vehicle did not stop at the stop sign but entered the intersection and struck Respondents' car, clearly supports this finding. "The causative violation of a statute constitutes negligence per se and is evidence of recklessness and willfulness, requiring the

---

3. S.C.Code Ann. § 56–5–2330(b) states:

Except when directed to proceed by a police officer, every driver of a vehicle approaching a stop sign shall stop at a clearly marked stop line but, if none, before entering the crosswalk on the near side of the intersection or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersecting roadway before entering it. After having stopped, the driver shall yield the right-of-way to any vehicle in the intersection or approaching on another roadway so closely as to constitute an immediate hazard during the time when such driver is moving across or within the intersection or junction of roadways.

4. S.C.Code Ann. § 56–5–2740 reads:

Every driver of a vehicle approaching a stop sign shall stop before entering the crosswalk on the near side of the intersection or, in the event there is no crosswalk, shall stop at a clearly marked stop line but, if none, then at the point nearest the intersecting highway where the driver has a view of approaching traffic on the intersecting highway before entering the intersection except when directed to proceed by a police officer or traffic-control signal.

submission of the issue of punitive damages to the jury." *Wise*, 315 S.C. at 276, 433 S.E.2d at 859. Violation of a statute does not constitute recklessness, willfulness, and wantonness per se, but is some evidence the defendant acted recklessly, willfully, and wantonly. *Id.* The jury determines whether a party has been reckless, willful, and wanton. *Id.* at 277, 433 S.E.2d at 859. However, even in cases involving disputed liability, punitive damages are sustainable if there is any evidence supporting a violation of a statute. *See, e.g., id.* (evidence of a violation of an applicable statute is a proper basis for submitting punitive damages to the trial jury); *Bethea v. Pedro Land, Inc.*, 290 S.C. 341, 350 S.E.2d 392 (Ct.App.1986) (affirming finding of punitive damages in automobile accident where record contained evidence from which the jury could draw inferences of gross negligence). Because the evidence supports the trial judge's finding that Appellant's agent violated a statute, we find it was proper to award punitive damages to Respondents.

Appellant claims the punitive damage awards were based on improper considerations by the trial judge. Appellant did not raise this argument at trial. Instead, Appellant raised this issue for the first time on appeal. This Court cannot address an issue not raised to the trial court. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."). Therefore, we decline to address whether the punitive damage awards were based on improper considerations.

### C. Punitive Damages

The trial court awarded $2,158,000 in punitive damages to Joseph and $442,000 to Sandra. We find the amount of punitive damages awarded to Sandra and Joseph was proper.

The Appellant, in its brief, does **NOT** analyze the issue of actual damages as compared to punitive damages. Rather, the Appellant, in a confusing and erroneous analysis states:

Joseph Austin was ultimately awarded $850,000.00 in actual damages, as well as the sum of $2,158,000.00 in

punitive damages. The testimony at the damages hearing averred that Mr. Austin had incurred total medical damages of $79,810.62 as of August 14, 2002. There was further testimony that future medical expenses could total as much as $90,200.00, for a total of $170,010.62.

The award of $850,000.00 actual damages is approximately 5 times the total figure of present and future medical expenses. Taking the $2,158,000.00 in punitives per the trial court's order, the total damages awarded Joseph Austin are more than 17 times the total medicals (present and future).

The Respondents provide little clarity in their brief:

Even if this Court were to analyze the Austins' punitive damage awards in terms of a multiple of their respective actual damages, this Court should still affirm the punitive damage awards. Joseph's punitive award is only 12.8 times his actual damages award and Sandra's punitive damage award is only a little over two times her actual damages award.

In contrariety to the mathematical comparisons presented by the Appellant and Respondents in their respective briefs, we calculate as follows:

(1) JOSEPH'S PUNITIVE DAMAGE AWARD IS 2.54 TIMES HIS ACTUAL DAMAGE AWARD.

(2) SANDRA'S PUNITIVE DAMAGE AWARD IS 2.5 TIMES HER ACTUAL DAMAGE AWARD.

In *Welch v. Epstein*, 342 S.C. 279, 536 S.E.2d 408 (Ct.App. 2000), this Court highlighted the case history regarding the determination of whether punitive damages comport with due process:

The Due Process Clause of the Fourteenth Amendment prohibits states from imposing grossly excessive punishments on tortfeasors. *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). In *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Supreme Court determined whether the Due Process Clause rendered a punitive damages award unconstitutional. The Court noted "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite ex-

treme results that jar one's constitutional sensibilities." *Id.* at 18, 111 S.Ct. at 1043, 113 L.Ed.2d at 20. In *Haslip,* the Court upheld the punitive damages award, finding Alabama's post-trial procedures for scrutinizing such awards and its appellate review "makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Id.* at 21, 111 S.Ct. at 1045, 113 L.Ed.2d at 22.

In response to *Haslip,* the South Carolina Supreme Court, in *Gamble, supra,* developed an eight factor post-verdict review which trial courts are required to conduct to determine if a punitive damages award comports with due process. The *Gamble* factors are:

> (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) as noted in *Haslip,* "other factors" deemed appropriate.

*Gamble,* 305 S.C. at 111–12, 406 S.E.2d at 354. Under *Gamble,* the trial court is not required to make findings of fact for each factor to uphold a punitive damage award. *McGee v. Bruce Hosp. Sys.,* 321 S.C. 340, 468 S.E.2d 633 (1996).

*Welch,* 342 S.C. at 305–06, 536 S.E.2d at 422.

 The trial judge is vested with considerable discretion over the amount of a punitive damage award. *See Kuznik v. Bees Ferry Assocs.,* 342 S.C. 579, 538 S.E.2d 15 (Ct.App.2000). This Court's review of the amount of punitive damages is limited to correction of errors of law. *South Carolina Farm Bureau Mut. Ins. Co. v. Love Chevrolet, Inc.,* 324 S.C. 149, 478 S.E.2d 57 (1996).

The trial court awarded Joseph punitive damages that are approximately 2.54 times his actual damages. In *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), the United States Supreme Court, in discussing punitive damages, stated:

[W]e have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.

123 S.Ct. at 1524 (citation omitted). In *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991), the Court found that an award greater than four times the amount of compensatory damages was approaching the line of constitutional impropriety. *Id.* at 23–24, 111 S.Ct. 1032. Thereafter, the Court, in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), cited the 4–to–1 ratio again, looking to a long legislative history dating back 700 years that provided for sanctions of double, treble, or quadruple punitive damages. *Id.* at 581, 116 S.Ct. 1589. The *Campbell* Court inculcated: "While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution. . . ." *Campbell,* 123 S.Ct. at 1524.

Utilizing *Gamble, Welch,* and *Campbell,* the punitive damage award in each instance is a single-digit multiplier and comports with due process.

The punitive damage award to Joseph, which was approximately 2.54 times his actual damage award, was NOT excessive. The punitive damage award to Sandra, which was approximately 2.5 times her actual damage award, was NOT excessive.

## II. APPELLANT'S LIABILITY FOR AGENT'S TORTS

■■ Respondents sued Appellant under a respondeat superior theory. Under the doctrine of respondeat superior, the employer is liable for the acts of an employee acting within the scope of employment. *South Carolina Ins. Co. v. James C. Greene & Co.,* 290 S.C. 171, 348 S.E.2d 617 (Ct.App.1986).

Appellant never contested Respondents' allegation that the driver of Appellant's truck was an employee of Appellant and was acting within the scope of his employment when the accident occurred. In fact, Appellant admitted this allegation upon entry of default. "It is well settled that by suffering a default, the defaulting party is deemed to have admitted the truth of the plaintiff's allegations and to have conceded liability." *Roche v. Young Bros. Inc.*, 332 S.C. 75, 81, 504 S.E.2d 311, 314 (1998).

Additionally, Respondents were not required to sue both principal and agent to recover from the principal under respondeat superior. *See Lane v. Home Ins. Co.*, 190 S.C. 84, 2 S.E.2d 30 (1939). They had the choice to sue either the agent or principal or join both. *See Lane*, 190 S.C. at 91, 2 S.E.2d at 32. Because the truck driver was acting within the scope of his employment at the time of the accident, the trial judge properly found Appellant liable for the driver's torts.

Appellant maintains the trial court erred in awarding damages based on the actions of the driver because the driver was previously dismissed as a party to this action. Appellant cites two cases to support its argument—*Kirby v. Gulf Ref. Co.*, 173 S.C. 224, 175 S.E. 535 (1934), and *Collins v. Johnson*, 245 S.C. 215, 139 S.E.2d 915 (1965). Appellant's reliance on these cases is misplaced. These cases only stand for the proposition that, when a principal and servant are sued together, a principal is not responsible for punitive damages under respondeat superior when the agent was *exonerated* from liability. In the instant case, the truck driver was *dismissed* as a party to the case, not *exonerated* from liability. Concomitantly, Appellant's argument fails.

### III. APPLICATION OF RULE 54(c), SCRCP

Appellant asserts the trial court erred in refusing to alter or amend the damages award based on Rule 54(c), SCRCP. Rule 54(c) provides "[a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment." Appellant argues Respondents' complaint limits the damages in the case, and therefore, the trial court erred when it granted Respondents' motion to open the judgment to amend the complaint to delete any

prayer for a specific sum. We decline to address this issue. Appellant did not appeal the ruling by the trial judge that granted the motion to open the judgment. A portion of a judgment that is not appealed presents no issue for determination by the reviewing court and constitutes, rightly or wrongly, the law of the case. *Greenville Cty. v. Kenwood Enters., Inc.*, 353 S.C. 157, 577 S.E.2d 428 (2003). Thus, allowing the complaint to be amended to delete any prayer for a specific sum is the law of the case.

## CONCLUSION

We rule the trial court did not err in the amount of actual damages awarded to Respondents. We hold the amount of punitive damages awarded to Sandra and Joseph was proper. The trial court properly concluded Appellant was liable for the torts committed by its agent. Accordingly, the decision of the trial judge is

**AFFIRMED.**

HEARN, C.J., and BEATTY, J., concur.