681 S.E.2d 897

**Peter S. SANTORO and Mary Santoro, Respondents,**

**v.**

**Warren H. SCHULTHESS, Appellant.**

**No. 4575.**

Court of Appeals of South Carolina.

Heard March 18, 2009.

Decided July 1, 2009.

Rehearing Denied Aug. 25, 2009.

Glenn Walters and R. Bentz Kirby, of Orangeburg, for Appellant.

William T. Toal, of Columbia, for Respondents.

GEATHERS, J.:

Appellant Warren Schulthess seeks review of an order requiring him to pay damages to Respondents Peter Santoro and Mary Santoro for trespass and for intentional interference with prospective contractual relations. Schulthess also appeals the requirements that he lower the level of his pond and remove a motor home from his property. We reverse.

## FACTS/PROCEDURAL HISTORY

In March 2002, Schulthess, a Columbia resident, purchased a pond (North Lake) and an adjoining triangular, unimproved parcel in Orangeburg County. At that time, the level of the pond was very low because its spillway had been leaking. Whenever he visited the pond to perform maintenance or make repairs to the spillway, Schulthess took his motor home and parked it on his adjoining triangular lot.

North Lake is surrounded by several residential lots in the Country Oaks subdivision, including three lots owned by the Santoros since 1993 (lots 1 through 3 in block "K" of the

subdivision).[1] The Santoros' home is located on the middle lot (lot 2). The deed to Schulthess's pond describes the pond as being bound on the south by lots 1 through 4 in block "K" of the subdivision, which includes the Santoros' three lots. The deed to lots 1 and 3 describes them as being bound on the north and northeast, respectively, by a ten-foot strip reserved by the developer to separate the lots from North Lake. In contrast, the deed for lot 2 describes its northeast boundary as simply North Lake.

In June 2002, the Santoros placed their home and the three lots on the market so they could move to Arizona. The Santoros' realtor, Century 21/The Moore Group (Century 21), listed their house and three lots for $319,000. When Schulthess discovered the realtor's sign on the Santoros' property, he visited a former colleague who worked for Century 21 to inquire about the Santoros' asking price. When he saw a copy of the real estate listing, he noticed that it represented the Santoros' property as extending ten feet into North Lake. In late June 2002, Schulthess wrote a letter to the Santoros' agent at Century 21 and copied the Santoros with the letter.

Schulthess's letter expressed disagreement with the representation that the Santoros' property extended ten feet into his pond and stated that the property line between the pond and many of the abutting properties was determined by the pond's high water level. The letter also stated that Schulthess had given permission to abutting owners to use the pond, but expressed concern about any prospective purchasers of the Santoros' property being given the wrong impression that the Santoros could convey any formal littoral rights to them.[2] Schulthess requested the agent to revise the listing so that the Santoros' property was not being advertised as "waterfront." Schulthess also stated that there was a structure on one of the Santoros' lots that encroached upon the pond.

---

1. The subdivision's original name was "Oakmont Subdivision" but later changed to "Country Oaks."

2. Littoral rights are special rights allowing owners of land abutting oceans, seas, or lakes to make "reasonable use" of the body of water for any lawful purpose. *White's Mill Colony, Inc. v. Williams*, 363 S.C. 117, 129, 609 S.E.2d 811, 817–18 (Ct.App.2005) (dicta).

As a result of Schulthess's letter, the Santoros' realtor revised the advertisement to delete the reference to the property extending ten feet into the water and suggested to the Santoros that they have their property resurveyed. According to the realtor's broker-in-charge, the claims made in Schulthess's letter had to be revealed to any prospective buyers of the Santoros' property. According to Schulthess, the Santoros never complained to him about the letter he wrote to Century 21.

The Santoros later engaged the Tatum Company to list their property for $298,500. On July 15, 2003, Schulthess wrote a letter to the Santoros' agent at the Tatum Company advising her that he owned the pond, that the Santoros' property only extended to the pond's edge, and that he had a five-foot easement around the pond's edge. Schulthess further stated that he understood that littoral rights applied only to natural waterways and not to private impoundments such as his pond. He suggested that the agent "legally qualify this matter" before offering fishing rights or access to the pond. He stated that he believed that those rights could only be conveyed by him. According to Mary Santoro, when the real estate agent showed the property to prospective buyers, "[W]e had to tell them that we could not pass the water rights on, [and] that they would have to get permission from [Schulthess]."

Sometime during the latter half of 2003, Schulthess placed a temporary stopper in the pond's leaking spillway. On November 24, 2003, South Carolina Department of Health and Environmental Control (DHEC) sent a letter to Schulthess after receiving complaints from the Santoros about the pond flooding their land. DHEC instructed Schulthess to return the spillway to normal operation within thirty days. DHEC also indicated that it was unsafe to rely on the emergency spillway to be the only spillway on the North Lake dam. The letter also stated that replacing the flashboards on the spillway would not require a permit from DHEC. Schulthess noted that in a telephone call about the letter, a DHEC representative instructed him to remove the temporary stopper in its entirety, which Schulthess removed three days after receiving DHEC's letter.

By January 2004, the Santoros still had not sold their property. They then filed a complaint against Schulthess, asserting a claim for trespass due to the flooding of their property and a claim for interference with prospective contractual relations based on Schulthess's letters to their realtors. The complaint also asserted that Schulthess violated the restrictive covenants for the Country Oaks subdivision by parking his motor home on his triangular lot.

In Spring 2004, Schulthess repaired the spillway. According to Mary Santoro, she saw Schulthess adding concrete to the spillway and she believed that the concrete addition raised the spillway's height. However, according to another abutting owner and Schulthess, the spillway was never raised and the concrete addition merely closed up a hole in the spillway.

Mary Santoro telephoned some contractors to obtain verbal estimates on the cost of supplies for filling in eroded land, building a retaining wall to prevent further erosion, and adding new topsoil and sod. Based on those phone calls, she understood the cost to be approximately $25,000.

After a trial on the Santoros' claims, the master issued an order concluding that a deed in Schulthess's chain of title made his triangular lot subject to a provision of the subdivision's restrictive covenants prohibiting house trailers and other temporary structures.[3] The master also concluded that Schulthess was liable to the Santoros on all of their claims. The master ordered Schulthess to pay damages to the Santoros in the amount of $108,000,[4] to lower the level of the pond, and to remove his motor home from his triangular lot. This appeal followed.

---

3. The original restrictive covenants were created in 1974. In 1990, the document was amended to allow for an increase in the allowable square footage of homes in the subdivision. In his order, the master conceded that the restrictive covenants as originally filed did not apply to Schulthess's triangular lot because it was not one of the specifically enumerated lots listed as being covered by the covenants. Nevertheless, the master found that certain language in a deed conveying the triangular lot to Schulthess's predecessor-in-title subjected the lot to the subdivision's restrictive covenants.

4. The master awarded $25,000 to the Santoros for the alleged trespass and $78,000 for the Santoros' claim for intentional interference with prospective contractual relations.

## ISSUES ON APPEAL

1. Did the evidence support the Santoros' cause of action for intentional interference with prospective contractual relations?

2. Did the evidence support the Santoros' cause of action for trespass?

3. Did the master err in concluding that Schulthess's triangular lot was subject to the restrictive covenants of the Country Oaks subdivision?

## STANDARD OF REVIEW

On direct appeal from a final judgment of a master-in-equity, the scope of review is the same as that for review of a case heard by a circuit court without a jury. *Tiger, Inc. v. Fisher Agro, Inc.,* 301 S.C. 229, 237, 391 S.E.2d 538, 543 (1989).

When legal and equitable causes of action are maintained in one suit, the court is presented with a divided scope of review. On appeal from an action at law that was tried without a jury, the appellate court can correct errors of law, but the findings of fact will not be disturbed unless found to be without evidence which reasonably supports the judge's findings. In an equitable action tried without a jury, the appellate court can correct errors of law and may find facts in accordance with its own view of the preponderance of the evidence.

*Blackmon v. Weaver,* 366 S.C. 245, 248–49, 621 S.E.2d 42, 43–44 (Ct.App.2005) (internal citations omitted); *see also Fields v. J. Haynes Waters Builders, Inc.,* 376 S.C. 545, 564, 658 S.E.2d 80, 90 (2008) (holding that the appellate court reviews questions of law de novo).

A tort action for damages is an action at law. *Longshore v. Saber Sec. Servs., Inc.,* 365 S.C. 554, 560, 619 S.E.2d 5, 9 (Ct.App.2005). Therefore, the Santoros' tort cause of action seeking damages for interference with prospective contractual relations is a legal cause of action, and this Court may not disturb the master's factual findings relating to this claim unless they lack evidentiary support. *Blackmon,* 366 S.C. at 248–49, 621 S.E.2d at 43–44.

As to the Santoros' trespass claim, they seek both damages and injunctive relief. Therefore, we must look to the action's main purpose as reflected by the nature of the pleadings, evidence, and character of relief sought to determine whether the claim is legal or equitable. *See Gordon v. Drews*, 358 S.C. 598, 604, 595 S.E.2d 864, 867 (Ct.App.2004) (holding that to determine whether an action is legal or equitable, this Court must look to the action's main purpose as reflected by the nature of the pleadings, evidence, and character of relief sought); *cf. Cedar Cove Homeowners Ass'n, Inc. v. DiPietro*, 368 S.C. 254, 258, 628 S.E.2d 284, 286 (Ct.App.2006) (holding that while a trespass action is generally an action at law, the trespass action at hand was equitable because the plaintiff withdrew its claim for damages and sought only an injunction).

The pleadings and evidence indicate that the Santoros' primary purpose in asserting their trespass claim was to require Schulthess to remove the pond's waters from the disputed location to enable them to fill in the eroded land and to add a retaining wall, topsoil, and sod. Because their primary purpose in asserting the trespass claim was to obtain injunctive relief, the claim is equitable in nature.[5] Therefore,

---

5. We recognize that the ownership of the land on which the claimed trespass occurred was in dispute and that prior appellate opinions characterize actions involving trespass claims as legal when the defendant challenges the plaintiff's ownership of the land. *See Mountain Lake Colony v. McJunkin*, 308 S.C. 202, 204, 417 S.E.2d 578, 579 (1992) (holding that because the defendant's answer raised an issue of paramount title to land, the plaintiff's action for damages for conversion of timber and trespass, for an injunction against entry of land, and for a declaratory judgment concerning the land's title was an action at law); *Corley v. Looper*, 287 S.C. 618, 620–21, 340 S.E.2d 556, 557 (Ct.App. 1986) (holding that an action for damages and injunctive relief preventing defendants from crossing a tract of land was in the nature of a trespass action to try title because a review of the evidence showed that the plaintiffs' primary purpose in bringing the action was to determine title to the disputed tract). However, these cases reveal that the plaintiffs' main purpose in bringing the action was the determination of title to the disputed tract. Thus, the *Mountain Lake* Court implicitly recognized that the main purpose in bringing the action is the overriding consideration in determining whether a claim is legal or equitable, and the *Corley* Court explicitly recognized the main purpose in bringing the action as the controlling consideration. In contrast to the Santoros' complaint, the complaint in *Mountain Lake* included a request for a declaratory judgment concerning the land's title. In *Corley*, this Court expressly concluded that the evidence revealed the plaintiff's

this Court must apply an equitable standard of review to the master's factual findings relating to this claim and may make findings according to its own view of the preponderance of the evidence. *Blackmon,* 366 S.C. at 248–49, 621 S.E.2d at 43–44. Nonetheless, this broad scope of review does not require this Court to disregard the findings at trial or ignore the fact that the master was in a better position to assess the credibility of the witnesses. *Laughon v. O'Braitis,* 360 S.C. 520, 524–25, 602 S.E.2d 108, 110 (Ct.App.2004).

The Santoros' remaining claim seeks an injunction to enforce their subdivision's restrictive covenants. Thus, this claim also sounds in equity. *See S.C. Dep't of Natural Res. v. Town of McClellanville,* 345 S.C. 617, 622, 550 S.E.2d 299, 302 (2001) (holding that an action to enforce restrictive covenants by injunction is in equity); *Cedar Cove,* 368 S.C. at 258, 628 S.E.2d at 286 ("Because the [plaintiff's] action is one to enforce restrictive covenants by injunction, it is in equity, and we may find facts in accordance with our own view of the evidence.") (citation omitted). Therefore, this Court may make findings related to this claim according to its own view of the preponderance of the evidence. *Blackmon,* 366 S.C. at 248–49, 621 S.E.2d at 43–44.

## LAW/ANALYSIS

### I. Intentional Interference with Prospective Contractual Relations

█ Schulthess argues that the Santoros failed to present sufficient evidence to establish their cause of action for intentional interference with prospective contractual relations and that the master erred in concluding otherwise. We agree.

█ To recover on a cause of action for intentional interference with prospective contractual relations, the plaintiff

---

primary purpose as the determination of title to the disputed tract. The *Corley* Court also noted that while the plaintiffs' complaint sought injunctive relief, the trial judge granted none and the plaintiffs did not object to his failure to grant the relief. Here, the Santoros' main purpose in bringing their action was simply to restore their surrounding environment to the condition it was in prior to Schulthess's work on the pond's spillway. The first step in that restoration was obtaining an injunction requiring Schulthess to lower the level of the pond.

must prove that the defendant intentionally interfered with the plaintiff's potential contractual relations for an improper purpose or by improper methods and that the interference caused injury to the plaintiff. *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 302 S.C. 265, 266, 395 S.E.2d 179, 180 (1990). If a defendant acts for more than one purpose, his improper purpose must predominate in order to create liability. *Id.* As an alternative to establishing an improper purpose, the plaintiff may prove that the defendant's method of interference was improper under the circumstances. *Id.*

### 1. *Interference*

First, Schulthess is not a stranger to any relationship that the Santoros would have with a prospective buyer because any littoral rights or privileges that the prospective buyer could expect would depend on Schulthess's rights as the pond owner.[6] Schulthess would play an essential role in the designation of any rights or privileges that future abutting owners have in the pond. Therefore, it is doubtful that the actions of Schulthess could conceptually fall within the scope of the term "interference." *Cf. Renden, Inc. v. Liberty Real Estate Ltd. P'ship III*, 213 Ga.App. 333, 444 S.E.2d 814, 818 (1994) (holding that to sustain a claim for intentional interference with business relations, the tortfeasor must be a "stranger" to the business relationship at issue).[7]

---

[6] *See White's Mill Colony, Inc.*, 363 S.C. at 130–35, 609 S.E.2d at 818–20 (holding that the owners of all or part of the bed of a private, manmade, nonnavigable pond have the right to exclude others from accessing or using the surface waters and noting that abutting landowners are free to bargain with the owner of the pond bed for the conveyance of an easement or some other right of access to the pond's waters).

[7] In *Renden*, the Georgia Court of Appeals explained that under appropriate circumstances, a party can be a nonsigner of a particular contract and yet not be a stranger to the contract itself or to the underlying business relationship. *Id.* The court concluded that the defendant in that case was not a stranger to the business relationship at issue, but rather, as a lessor, was an essential entity in a prospective lessor/lessee/sublessee relationship. *Id.* Here, Schulthess would be an essential player in the designation of any rights or privileges that abutting owners would have in the pond.

## 2. *Prospective Contractual Relations*

Schulthess argues that the Santoros failed to establish any prospective contractual relations because they did not present evidence of any specific prospective buyer who was "chilled" by Schulthess's letters or who would have purchased the Santoros' property but for Schulthess's claims. We agree.

This Court explained the phrase "prospective contractual relations" in *United Educ. Distrib., LLC v. Educ. Testing Serv.*, 350 S.C. 7, 14–18, 564 S.E.2d 324, 328–30 (Ct.App.2002). In that case, United Educational Distributors (UED), which sold study aids to military personnel, asserted an intentional interference claim against a nonprofit corporation that administered and prepared materials for college admission tests, Educational Testing Service (ETS). *Id.* at 10, 564 S.E.2d at 326. UED claimed that the response to their mail advertising diminished after ETS made a concerted effort to prevent UED from obtaining new business. *Id.* at 11–12, 564 S.E.2d at 326–27. The Court noted that (1) UED had not alleged that it had a reasonable probability of entering into a specific contract **but for** the interference with ETS; and (2) UED had no way of knowing who did not respond to their mail ads and why they did not respond. *Id.* at 18, 564 S.E.2d at 330 (emphasis added).

This Court stated that a cause of action for intentional interference with prospective contractual relations "generally stands following the loss of an identifiable contract or expectation." *Id.* at 14, 564 S.E.2d at 328. We held that the plaintiff must demonstrate that he had a truly prospective or potential contract with a third party; that the agreement was a close certainty; and that the contract was not speculative. *Id.* at 15, 17, 564 S.E.2d at 329–30.

Here, Mary Santoro testified that a few people looked at their property. However, she did not testify as to any specific prospective purchaser who would have made an offer on the property but for the existence of the claims that Schulthess asserted in his letters to the realtors. Rather, she spoke in generalities:

Q. Did you ever have to reveal to anyone the contentions made by Mr. Schulthess?

A. Yes. When Tatum showed the house on the second contract that I had a year later, they showed the property to a person who was interested in the property. When they look at our house, they always ask questions about the water, if they have water rights, all that type of thing, how much—what kind of fish are in it, what kind of boat they can put on it, and that kind of thing. So at that point, we had to tell them that we could not pass the water rights on, that they would have to get permission from the new owner.

. . .

Q. Did you ever have any buyer come forward and sign a contract and say they want to buy the property?

A. No. Because when they asked the question about the lake and I can't give them water rights, people who want the lake are not going to make the contract. It discourages them because they want—they come to look at the house because it's on the lake, generally.

This testimony points to no identifiable prospective buyer who considered the perceived lack of water rights to be the sole deal-breaker, and, therefore, the Santoros presented insufficient evidence that an identifiable third party was influenced by Schulthess's communications with the Santoros' realtors. *See Walker v. Sloan,* 137 N.C.App. 387, 529 S.E.2d 236, 242 (2000) (holding that to state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them and that the contract would have ensued but for the interference); *cf. Bocook Outdoor Media, Inc. v. Summey Outdoor Adver., Inc.,* 294 S.C. 169, 178, 363 S.E.2d 390, 394 (Ct.App.1987) (holding that to maintain a cause of action for interference with a contract that is terminable at will, the plaintiff must show that, but for the interference, the contractual relationship would have continued), *overruled on other grounds by O'Neal v. Bowles,* 314 S.C. 525, 431 S.E.2d 555 (1993).

Furthermore, the master concluded that it was "more likely than not" that the Santoros' property would have been sold within six months at the listing price had they not been required to disclose the claims in Schulthess's letters. The

master based this finding, at least in part, on the testimony of the broker-in-charge at Century 21, Jeannine Keys. Ms. Keys stated that she hoped all of the properties her agency listed would sell within ten percent of the listing price and within the listing period. Mary Santoro also testified that she hoped to sell the property within six months to a year. The testimony of these witnesses does not reasonably support the master's finding that the property "more likely than not" would be sold within six months. Based on the foregoing, the evidence of a prospective contractual relation was purely speculative and therefore did not support a claim for intentional interference with prospective contractual relations.

### 3. *Improper Purpose or Method*

Schulthess argues that he could not be found liable for intentional interference because he was merely asserting his property rights. We agree.

■ We find no evidence in the record to suggest any purpose or motive by Schulthess other than the pursuit of his own legal rights. "Generally, there can be no finding of intentional interference with prospective contractual relations if there is no evidence to suggest any purpose or motive by the defendant other than the proper pursuit of [his or her] own contractual rights with a third party." *Eldeco, Inc. v. Charleston County Sch. Dist.*, 372 S.C. 470, 482, 642 S.E.2d 726, 732 (2007) (quoting *S. Contracting, Inc. v. H.C. Brown Constr. Co.*, 317 S.C. 95, 102, 450 S.E.2d 602, 606 (Ct.App. 1994)).

Here, Schulthess had a bona fide right to express concern about the statements in the realtor listings. There is insufficient evidence in the record that the abutting owners had any legal rights in the pond as opposed to revocable permission informally given by Schulthess and previous owners of the pond.[8] The Santoros introduced only a 1976 letter authored by the son of the developer's principal that described abutting

---

**8.** *See White's Mill Colony, Inc.*, 363 S.C. at 134–35, 609 S.E.2d at 820 (noting that owners of land abutting a private, manmade, nonnavigable pond are free to bargain with the owner of the pond bed for the conveyance of an easement or some other right of access to the pond's waters).

owners' "rights to th[e] lake." There is no reliable evidence in the record to indicate that the abutting owners were in fact granted littoral rights in this private pond. Rather, the record indicates that the developer and subsequent pond owners, including Schulthess, had given merely revocable permission to the abutting owners and their guests to use the pond.

Moreover, even if some of the legal claims in Schulthess's letters were inaccurate, there is no evidence to support the master's implicit finding that Schulthess knew that the claims were inaccurate when he made them.[9] Additionally, the master made no conclusion that Schulthess should have known of any inaccuracies or should have consulted with legal counsel before sending the letters.

There is no evidence in the record to suggest any purpose or motive by Schulthess other than the pursuit of his own legal rights. Additionally, nothing in the record supports the master's conclusion that Schulthess used an improper method to pursue his rights.[10] The fact that the Santoros' realtor was obligated to reveal to prospective buyers the claims in Schulthess's letters did not make it improper for Schulthess to send the letters to the realtors.

Based on the foregoing, the master erred in concluding that Schulthess intentionally interfered with any potential contractual relations of the Santoros for an improper purpose or by an improper method. *See Eldeco, Inc.*, 372 S.C. at 482, 642 S.E.2d at 732; *see also Brown v. Stewart*, 348 S.C. 33, 55–56, 557 S.E.2d 676, 688 (Ct.App.2001) (affirming the circuit court's

9. The master found that Schulthess "intentionally sent false claims to the realtor, knowing that the claim [sic] would have to be revealed."

10. *See Love v. Gamble*, 316 S.C. 203, 215, 448 S.E.2d 876, 883 (Ct.App. 1994) (explaining that methods of improper interference include: (1) those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common law rules; (2) violence; (3) threats or intimidation; (4) bribery; (5) unfounded litigation; (6) fraud, misrepresentation, or deceit; (7) defamation; (8) duress; (9) undue influence; (10) misuse of inside or confidential information; (11) breach of a fiduciary relationship; (12) violation of established standard of a trade or a profession; (13) unethical conduct; or (14) sharp dealing, overreaching, or unfair competition). While this list is not necessarily exhaustive, it provides a reliable standard of comparison for determining whether a method is improper.

grant of a directed verdict motion on a claim for intentional interference with prospective contractual relations on the basis that the exercise of a legal right does not constitute an improper motive or improper purpose and stating that there was no evidence to suggest any purpose or motive by the defendant other than the protection of his rights); *S. Contracting, Inc.*, 317 S.C. at 102, 450 S.E.2d at 606 (affirming summary judgment on a claim for intentional interference with prospective contractual relations on the ground that there was no evidence to suggest any purpose or motive by the defendant other than the proper pursuit of its contract rights with the codefendant).

### 4. *Damages*

Schulthess argues that there was insufficient evidence of damages resulting from his letters to the Santoros' realtors to sustain a claim for intentional interference with prospective contractual relations. We agree.

 "The trial judge has considerable discretion regarding the amount of damages, both actual or punitive." *Austin v. Specialty Transp. Servs., Inc.*, 358 S.C. 298, 310–311, 594 S.E.2d 867, 873 (Ct.App.2004). Because of this discretion, this Court's review on appeal is limited to the correction of errors of law. *Id.* This Court's task in reviewing a damages award is not to weigh the evidence, but to decide if any evidence exists to support the damages award. *Id.*

Here, the master found that Mary Santoro's testimony on the increase in mortgage rates sufficiently supported the Santoros' claim for damages:

I find that the mortgage rate increase and damages flowing from that increase are not speculative. The Plaintiff testified that the mortgage interest rate was up [two percent] and that over the life of a loan for thirty (30) years the additional costs will be $78,000. Both of these are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. See S.C.R. Evid. 201 C. [sic] I find that the damages from the intentional interference which [sic] prospective contracted [sic] relations are $78,000.00.

Mary Santoro's testimony regarding the rise in interest rates is insufficient evidence of damages because it is based on the speculative assumptions that (1) the Santoros could have found a suitable new home immediately after selling their property in Country Oaks; (2) they could have immediately obtained a suitable mortgage loan; and (3) Mary Santoro had sufficient personal knowledge of the interest rate that an unknown lender would charge them based on their particular circumstances. Therefore, there is insufficient evidence to support the damages award on the intentional interference claim. *See Whisenant v. James Island Corp.*, 277 S.C. 10, 13, 281 S.E.2d 794, 796 (1981) (holding that in order for damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount with reasonable certainty or accuracy and that neither the existence, causation, nor amount of damages can be left to conjecture, guess, or speculation).

## II. Trespass

Schulthess argues that the evidence does not support the Santoros' trespass cause of action and that the master erred in awarding damages and ordering an injunction for this claim. We agree.

 For a trespass action to lie, the act must be affirmative, the invasion of the land must be intentional, and the claimed harm must be the direct result of that invasion. *Hawkins v. City of Greenville*, 358 S.C. 280, 297, 594 S.E.2d 557, 566 (Ct.App.2004).

 Here, the Santoros claim that Schulthess's actions of temporarily stopping up the pond's spillway and subsequently permanently repairing the spillway resulted in an invasion of their land causing permanent damage. We find insufficient evidence in the record to support this claim. The Santoros presented no reliable evidence of permanent damage **directly resulting** from the three days of flooding caused by the placement of the temporary stopper in the spillway. As to Schulthess's permanent repair of the spillway, there was insufficient evidence of a resulting invasion of the Santoros' land as is required to grant relief for trespass.

Regarding the placement of the temporary stopper in the spillway, counsel for Schulthess conceded that the stopper temporarily raised the spillway from its original level for the three days that it was in place. And Schulthess does not claim that his pond bed extends past the water level that would result from the proper functioning of the spillway at its original level. Rather, he argues that the boundary between his pond bed and lot 2 is North Lake at "full pool," which he characterizes as the point at which the water begins to fall over a properly functioning spillway.[11] Hence, Schulthess's concession that the temporary stopper raised the spillway beyond its original level compels the conclusion that the resulting water level extended past the original pond bed to invade lot 2 for a three-day period.

However, the master's award of injunctive relief as well as $25,000 in damages for this fleeting trespass is not supported by the evidence. The Santoros failed to present reliable evidence that any permanent damage directly resulted from the three days of flooding. Although counsel for Schulthess questioned Mary Santoro about the allegation in her complaint that the value of her land had diminished, she did not give any opinion as to any amount of diminution in the property's value. In fact, she indicated that there was no significant change in the value of her land from 2002 to the date of trial. Further, the evidence shows that the Santoros contributed to the erosion of which they complained by neglecting to control the effect of rainfall on the downward slope of their land and by cutting down several trees and burning vegetation. Therefore, we find no evidence of permanent damage directly resulting from Schulthess's temporary trespass.

■■■ As to Schulthess's permanent repair of the spillway, we find no resulting invasion of the Santoros' land, which is required to grant relief for trespass. *See Hawkins,* 358 S.C. at 297, 594 S.E.2d at 566 (requiring an invasion of land to establish trespass). The probative value of the Santoros' evidence of the boundary between their property and the pond is questionable, especially in light of the discrepancies between

---

11. The Santoros' deed to lot 2 corroborates Schulthess's assertion that the northeast boundary for lot 2 is North Lake itself. Lot 2 does not have a ten-foot buffer separating it from the pond as do lots 1 and 3.

the plats commissioned by the Santoros and the original subdivision plat.[12] Further, Mary Santoro conceded that the spillway was leaking when she and her husband purchased their property and that the resulting level of the pond was below its original level until Schulthess purchased the pond and began working on the spillway. Moreover, her claim that Schulthess raised the level of the spillway **above its original level** when he made **permanent** repairs was not supported by probative evidence. Therefore, we find that the Santoros did not carry their burden of showing that the water level resulting from the spillway's repair invaded their land.

In any event, the evidence of damages that the Santoros claim resulted from the spillway's repair was not reliable because the contractors from whom Mary Santoro obtained supply cost estimates did not view the property in question, and they were not available at trial for questioning. *See Whisenant*, 277 S.C. at 13, 281 S.E.2d at 796 (holding that in order for damages to be recoverable, the evidence should be such as to enable the court or jury to determine the amount with reasonable certainty or accuracy and that neither the existence, causation, nor amount of damages can be left to conjecture, guess, or speculation).

Based on the foregoing, the master erred in awarding injunctive relief and damages to the Santoros on their trespass claim.

### III. Restrictive Covenants

As to the Santoros' cause of action to enforce their subdivision's restrictive covenants, Schulthess argues that his triangular lot is not subject to the restrictive covenants, which prohibits house trailers and other temporary structures. We agree.

The master conceded that the subdivision's restrictive covenants as originally filed did not apply to Schulthess's triangular lot because it was not one of the specifically enumerated lots listed as being covered by the covenants. However, the master concluded that the language in a deed in

---

12. As there is no evidence in the record to the contrary, we presume that the original subdivision plat was prepared when the pond's spillway was functioning properly and the water level was at "full pool."

Schulthess's chain of title made his triangular lot subject to the restrictive covenants. Schulthess asserts that the deed's language does not make his lot subject to the restrictive covenants. Thus, we must determine the meaning of the language in question.

> In construing a deed, "the intention of the grantor must be ascertained and effectuated, unless that intention contravenes some well settled rule of law or public policy." "In determining the grantor's intent, the deed must be construed as a whole and effect given to every part if it can be done consistently with the law." "The intention of the grantor must be found within the four corners of the deed."

*Windham v. Riddle*, 381 S.C. 192, 201, 672 S.E.2d 578, 582–83 (2009) (internal citations omitted). As to restrictive covenants, the paramount rule of construction is to give effect to the intent of the parties as determined from the whole document. *McClellanville*, 345 S.C. at 622, 550 S.E.2d at 302.

> The court may not limit a restriction in a deed, **nor, on the other hand, will a restriction be enlarged or extended by construction or implication beyond the clear meaning of its terms even to accomplish what it may be thought the parties would have desired had a situation which later developed been foreseen by them at the time when the restriction was written.** It is still the settled rule in this jurisdiction that restrictions as to the use of real estate should be strictly construed and **all doubts resolved in favor of free use of the property,** subject, however, to the provision that this rule of strict construction should not be applied so as to defeat the plain and obvious purpose of the instrument. It follows, of course, that where the language of the restrictions is equally capable of two or more different constructions that construction will be adopted which least restricts the use of the property. A **restriction on the use of property must be created in express terms or by plain and unmistakable implication,** and all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property.

*Id.* (emphasis in original) (quoting *Taylor v. Lindsey*, 332 S.C. 1, 4–5, 498 S.E.2d 862, 863–64 (1998)).

 The determination of the grantor's intent when reviewing a clear and unambiguous deed is a question of law for the court. *Hunt v. Forestry Comm'n,* 358 S.C. 564, 568, 595 S.E.2d 846, 848 (Ct.App.2004). Likewise, the determination of whether the language of a restriction in a deed is ambiguous is a question of law.[13] *See McClellanville,* 345 S.C. at 623, 550 S.E.2d at 302–03 (applying rules of contract construction to a restrictive covenant in a deed). This Court reviews questions of law de novo. *Fields v. J. Haynes Waters Builders, Inc.,* 376 S.C. 545, 564, 658 S.E.2d 80, 90 (2008). In other words, a reviewing court is free to decide questions of law with no particular deference to the trial court. *Hunt,* 358 S.C. at 569, 595 S.E.2d at 848–49.

 If this Court decides that the language in a deed is ambiguous, the determination of the grantor's intent then becomes a question of fact. *See McClellanville,* 345 S.C. at 623, 550 S.E.2d at 303 (applying rules of contract construction to a restrictive covenant in a deed). As to this claim to enforce the subdivision's restrictive covenants, we may find facts in accordance with our own view of the preponderance of the evidence. *See McClellanville,* 345 S.C. at 622, 550 S.E.2d at 302 (holding that an action to enforce restrictive covenants by injunction is in equity); *Cedar Cove,* 368 S.C. at 258, 628 S.E.2d at 286 ("Because the [plaintiff's] action is one to enforce restrictive covenants by injunction, it is in equity, and we may find facts in accordance with our own view of the evidence.") (citation omitted). Regardless, whether we view the determination of the grantor's intent as a question of law or as a question of fact, we conclude that the grantor did not intend to subject the triangular lot to the subdivision's restrictive covenants.

The deed in question evidences four separate conveyances of property to W.M. Harvey, IV. A clause immediately following the **third** listed property description (for Lot 23 in Block "S" in the subdivision) states,

**This conveyance** is made subject to restrictive covenants and conditions as are contained in an Agreement dated

---

**13.** "A contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation." *McClellanville,* 345 S.C. at 623, 550 S.E.2d at 302.

April 22, 1974 of record in the office of the REM for Orangeburg County in Deed Book 395, at Page 573.

TMS# 0137–00–10–016

(emphasis added). In stark contrast, the other three property descriptions in the deed, including the description of Schulthess's triangular lot, did not have any similar language following them; each description was merely followed by a tax map number.

■■■ Contrary to the master's implicit interpretation of the deed, the plain meaning of the term "conveyance"—the way it is most commonly used and understood—is the actual **transfer** of the property itself rather than the deed evidencing the transfer. *See* Black's Law Dictionary 357–58 (8th ed.2004) (defining "conveyance" in the following **descending** order: "1. The voluntary transfer of a right or of property ... 2. The transfer of a property right that does not pass by delivery of a thing or merely by agreement. 3. The transfer of an interest in real property from one living person to another, by means of an instrument such as a deed. 4. The document ( [usually] a deed) by which such a transfer occurs."). Hence, a deed evidencing the transfer of multiple parcels does not constitute a single "conveyance" as that term is commonly used and understood.

Therefore, the plain meaning of the deed's language regarding restrictive covenants is that the transfer of the property described in the immediately preceding paragraph (i.e., "Lot # 23", Block "S, on a plat of Oakmont Subdivision"), rather than all four parcels described in the deed, was subject to the restrictive covenants. If the grantor had intended to make the remaining parcels subject to the restrictive covenants, the plural form of the term "conveyance" would have been used and either the restrictive language would have followed the deed's final property description or similar restrictive language would have immediately followed the property description of each parcel so that the application of the restrictive covenants to all four parcels would have been unmistakable. *See McClellanville*, 345 S.C. at 622, 550 S.E.2d at 302 (requir-

ing restrictions to be created in express terms or **by unmistakable implication** and doubts to be resolved in favor of free use of property) (emphasis added); *Windham*, 381 S.C. at 201, 672 S.E.2d at 582–83 (requiring determination of grantor's intent in deed from whole document).

Our conclusion that the grantor did not intend to subject Schulthess's triangular lot to the restrictive covenants is consistent with the geography of the various parcels described in the deed. Only one of the four property descriptions was for a typical residential subdivision lot (Lot # 23, Block "S"), and that description logically preceded the deed's language regarding restrictive covenants. In contrast, two of the deed's four property descriptions were for parcels that were not part of the subdivision—a parcel on Wannamaker Street in the City of Orangeburg and Schulthess's triangular parcel. Moreover, another property description was for North Lake itself. Clearly, the geography of the North Lake parcel and the parcels located outside the subdivision make it highly improbable that the grantor intended to subject them to the subdivision's restrictive covenants.

In sum, the language of the deed in question makes only one of its four conveyances subject to the subdivision's restrictive covenants—that conveyance immediately preceding the language concerning the restrictive covenants (Lot 23 of Block "S" in Oakmont). Therefore, the master erred in concluding that the restrictive covenants applied to Schulthess's triangular parcel and in requiring him to remove his motor home from the property.

## CONCLUSION

Accordingly, the master's order is

**REVERSED.**

SHORT and THOMAS, JJ., concur.