754 S.E.2d 888

**Larry E. KINARD, Appellant,**

v.

**Douglas S. RICHARDSON and Julie
D. Richardson, Respondents.**

**Appellate Case No. 2013–000162.**

**No. 5192.**

Court of Appeals of South Carolina.

Heard Dec. 12, 2013.
Filed Jan. 29, 2014.
Rehearing Denied March 21, 2014.

248

250

John R. Polito, of Goose Creek, for Appellant.

P. Brandt Shelbourne, Shelbourne Law Firm, of Summerville, for Respondents.

GEATHERS, J.

Appellant Larry E. Kinard (Owner) challenges an order of the Master-in-Equity declining to enjoin Respondents Douglas S. Richardson and Julie D. Richardson (Neighbors) from leasing their property to a third party for the purpose of horse grazing. We reverse and remand.

## BACKGROUND

This case revolves around the intent of developers James and Delene Barnes (Developers) to restrict the use of property within Senrab Farms subdivision as well as certain property adjacent to Senrab Farms. Developers originally owned a 49.7 acre parcel near Summerville from which they created Senrab Farms. After carving out and conveying approximately 5.5 acres of the 49.7 acre parcel to James and Helen Madison, Developers subdivided most of the remainder into lots "A" through "I" of Senrab Farms, together with "14.19 acres Residual," as shown on a plat dated July 5, 1997. All lots in Senrab Farms were restricted to residential use, but lot owners were permitted to keep one horse on their respective lots subject to certain conditions.

In January 1998, Developers sold lot "F" at 217 Saddle Trail to Owner. Developers subsequently sold to Neighbors' building contractor 7 acres from the "Residual," located at 124 Saddle Trail and across the street from Owner's lot. This property was designated as "Tract L" on a plat dated December 29, 1997. Tract L was immediately east of and adjacent to the Madisons' 5.5 acre parcel. After Neighbors acquired Tract L in December 1998, they subdivided it and leased part of it to other individuals for horse grazing.

Specifically, on April 1, 2003, Neighbors filed a plat showing the subdivision of Tract L into two smaller tracts, Tract A and Tract B, so that they could use part of their property, i.e., Tract B, for horse grazing. By this time, Helen Madison had sold the 5.5 acre parcel adjacent to Tract L to Hoa Van Nguyen and Xuan Thi Nguyen, two of the original defendants to this action. While this parcel was not part of Senrab Farms, its use had been restricted to residential or agricultural, and it had an existing barn on it when the Nguyens purchased it.

Neighbors also incorporated a leasing business by the name of "Greener Pastures," which generated gross income of $6,825.00 from 2003 through early 2008. On their 2009 tax return, Neighbors reported "Gross farm rental income" of $3,050. Neighbors leased Tract B to certain individuals, and the Nguyens allowed these individuals to operate the business "Senrab Equestrian Center" out of the barn on the Nguyens' property.[1]

During the years that Greener Pastures leased Tract B, Owner noticed an increase in (1) the number of horses grazing on Tract B; (2) horse manure buildup on Tract B; (3) vehicle and horse traffic in the subdivision streets; and (4) litter, dust clouds, noise, odors, and insects in the area. In 2007, Owner reported to Dorchester County officials his suspicion that a business was being operated on the Nguyens' property. However, the county zoning administrator determined that the operation was not a business because there was "no evidence of money changing hands." In 2009, Owner discovered that Senrab Equestrian Center was selling horses on the Internet at "senrabfarm.com." The center's website stated that it was "located on 15 acres in the middle of the Senrab Farm[s] subdivision in Summerville, SC" and noted "We have two large grass pastures...." One of these pastures was Neighbors' Tract B.

After Owner reported this discovery to the County, the zoning administrator sent a "cease and desist" letter to the Nguyens. After a hearing before the Board of Zoning Appeals, the Board found that Senrab Equestrian Center advertised horse sales, horse jumping, dressage, and horse care services. The Board ordered the Nguyens to immediately cease and desist operating the business. According to Owner's original Complaint in this action, the Nguyens did not appeal the Board's order. However, the Nguyens filed a petition for annexation into the Town of Summerville and for agricultural conservation zoning, which allowed certain com-

---

1. The record reflects that Charity Filmore operated Senrab Equestrian Center for a time and, subsequently, Madeline Ingalls operated the business. The exact dates that these individuals operated the business are unclear, although the record indicates that Ingalls was operating the business in January 2010 when she executed a written commercial lease for the use of Tract B as a horse pasture.

mercial operations. Summerville Town Council granted the petition.

On December 8, 2009, Owner filed a Complaint against the Town of Summerville, the Nguyens and Senrab Farms Homeowners Association, asserting the following causes of action: (1) "Declaratory Judgment—Unlawful Annexation;" (2) "Declaratory Judgment—Unlawful Zoning;" (3) "42 United States Code Section 1983;" and (4) "Breach of Covenants Against Hoa Van and Xuan Thi Nguyen." Owner based the Breach of Covenants cause of action on a document entitled "Reciprocal Covenants," which restricted the use of the Nguyens' property to residential or agricultural use. Owner sought damages and an injunction against the Nguyens' use of their property for business purposes.

On January 10, 2010, Greener Pastures executed a written lease, entitled "Commercial Lease," for Tract B to Madeline Ingalls, who was operating Senrab Equestrian Center at that time. The lease agreement provided for the use of Tract B as a horse pasture. Subsequently, Owner filed his Amended Complaint, adding Madeline Ingalls and Neighbors as defendants. The Amended Complaint sought declaratory and injunctive relief, asserting the following causes of action: (1) "Declaratory Judgment—Unlawful Annexation;" (2) "Declaratory Judgment—Unlawful Zoning;" (3) "Breach of Covenants and Easement Rights Against the Nguyens;" and (4) "Breach of Covenants by [Neighbors]." Owner based the Breach of Covenant cause of action against Neighbors on the Restrictive Covenants governing the permitted use of the lots in Senrab Farms.

On November 17, 2010, Owner and the Nguyens entered into a settlement agreement amending the original Reciprocal Covenants concerning the 5.5 acre parcel. This amendment restricted the leasing of the barn, stable and pasture on the property to boarding purposes only, with a boarding limit of ten horses.[2] On April 19, 2010, Neighbors filed their Answer, asserting the affirmative defenses of "Unclean Hands" and "Statute of Limitations." On April 29, 2010, Neighbors filed their Amended Answer, admitting that at that time they were

---

2. According to the parties' briefs, Owner also settled with the Town of Summerville and the Senrab Farms Homeowners Association.

leasing Tract B to Madeline Ingalls in support of equestrian business operations. On May 11, 2010, Owner and Neighbors filed cross-motions for summary judgment.

Owner's memorandum of law in support of his summary judgment motion asserted the following grounds: (1) Neighbors were not using Tract B as a single-family residential building lot, as required by the subdivision's Restrictive Covenants; (2) a purported amendment to the Restrictive Covenants that allowed up to six horses on Neighbors' property ("Amendment to Restrictions") was invalid; and (3) even if the amendment was valid, Neighbors' subdivision of their property from Tract L into Tracts A and B destroyed their right to have six horses on their property pursuant to the amendment. The record does not indicate the grounds for Neighbors' summary judgment motion.

The presiding circuit judge, the Honorable Edgar Warren Dickson, issued an order concluding that Tracts A and B were "subject to any covenants and restrictions that applied to the original Tract L . . . ." However, Judge Dickson also ruled that whether the original Restrictive Covenants or the Amendment to Restrictions applied to Neighbors' property was an issue to be determined at trial, and, thus, he denied the "remaining portions" of the cross-motions for summary judgment. Judge Dickson later denied Owner's motion for reconsideration.

Subsequently, the case was referred to the Master–in–Equity for a merits hearing. On September 28, 2012, the master signed an order denying Owner's request for declaratory and injunctive relief. In this order, the master acknowledged Judge Dickson's order on the cross-motions for summary judgment and stated "[t]he questions of fact that remained . . . were whether [Neighbors] are or were in compliance with the terms of the applicable covenants and restrictions and which of the restrictions apply." The master concluded that the original Restrictive Covenants did not apply to Neighbors' property. She reasoned that an amendment was required to make any additional property subject to the Restrictive Covenants and after Developers sold the last of the six lots that were originally subject to the Restrictive Covenants, they no longer held a sufficient property

interest to effect an amendment to the Restrictive Covenants.

Based on this reasoning, the master concluded that the restrictions set forth in the "Amendment to Restrictions," dated February 25, 1998, were actually original restrictions on the property.[3] The master also concluded that Owner was not in privity with Neighbors and had no authority to enforce the restrictions applicable to Neighbors' property. The master found that Neighbors' leasing of their property to third parties for horse grazing was not a commercial use and, thus, Neighbors had complied with the restriction requiring single-family residential use.

Owner filed a motion for reconsideration of the master's order, or, in the alternative, a motion for a new trial. On December 6, 2012, the master signed an order denying the new trial motion and upholding the September 28, 2012 order. However, the master set forth additional findings of fact and conclusions of law in the December 6, 2012 order.

The master found that Tract B was "akin to [Neighbors'] yard of their residence." The master further stated "The fact that the actual residence does not occupy both lots does not mean that [Neighbors] are not using their property for residential purposes. They live there." The master also stated "The [c]ourt finds credible [Neighbors'] argument that they do not keep more than six horses at a time on their property and that nothing in [the] restrictions prevents a neighbor from riding their horse over for a visit. A visit is vastly different from continuous keeping of a horse." The master also stated "The [c]ourt finds not credible [Owner's] claim that [Neighbors'] keeping of six horses on their property is ruining [his] quality of life."

The master based this statement on Owner's settlement of his litigation with the Nguyens. This appeal follows.

## ISSUES ON APPEAL

1. Did the master err in declaring that Neighbors' Tract B was not subject to the original Restrictive Covenants?

---

3. This document restricted the use of Neighbors' property to residential but allowed for up to six horses to be kept on the property.

2. Did the master err in finding that Owner lacked privity of contract or standing to enforce the Restrictive Covenants?

3. Did the master err in concluding that the "Amendment to Restrictions" was an original restriction on Neighbors' property?

4. Did the master err in finding that Neighbors used Tract B as their yard and that they lived there?

5. Did the master err in concluding that Neighbors complied with the covenant restricting the use of their property to single-family residential use?

6. Did the master err in concluding that Neighbors complied with the covenant restricting the number of horses allowed on the property?

7. Do the equities warrant enjoining Neighbors from continued covenant violations?

## STANDARD OF REVIEW

"Declaratory judgments in and of themselves are neither legal nor equitable." *Campbell v. Marion Cnty. Hosp. Dist.*, 354 S.C. 274, 279, 580 S.E.2d 163, 165 (Ct.App.2003). "The standard of review for a declaratory judgment action is therefore determined by the nature of the underlying issue." *Id.* Here, Owner seeks the enforcement of his subdivision's restrictive covenants. An action seeking an injunction to enforce restrictive covenants sounds in equity. *S.C. Dep't of Natural Res. v. Town of McClellanville*, 345 S.C. 617, 622, 550 S.E.2d 299, 302 (2001). In an equitable action, this court may make findings according to its own view of the preponderance of the evidence. *Id.* However, this court is not required to disregard the master's factual findings or ignore the fact that the master was in the better position to assess the credibility of the witnesses. *Oskin v. Johnson*, 400 S.C. 390, 397, 735 S.E.2d 459, 463 (2012).

## LAW/ANALYSIS

### I. Applicability of Restrictive Covenants

Owner argues the master erred in declaring that Neighbors' Tract B was not subject to the original Restrictive Covenants.

On the other hand, Neighbors argue that their Tracts A and B, previously designated as "Tract 'L', Senrab Farms," were never included in the subdivision. We agree with Owner that Tract L was always part of the subdivision and was subject to the original Restrictive Covenants.

We first review the law governing restrictive covenants and the interpretation of language in restrictive covenants and in deeds. Restrictive covenants, sometimes referred to as "real covenants," are agreements "to do, or refrain from doing, certain things with respect to real property." *Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp.*, 368 S.C. 342, 361, 628 S.E.2d 902, 913 (Ct.App.2006) (citation and quotation marks omitted).

> Therefore, covenants, in a sense are contractual in nature and bind the parties thereto in the same manner as would any other contract. Restrictive covenants are construed like contracts and may give rise to actions for breach of contract. However, restrictive covenants affecting real property cannot be properly and fully understood without resort to property law.
>
> Restrictive covenants differ from contracts in that they run with the land, meaning that they are enforceable by and against later grantees.

*Id.* (citations and quotation marks omitted). "There are several ways in which restrictive covenants may be created. The most common means are: (1) by deed; (2) by declaration; and (3) by implication from a general plan or scheme of development." *Id.* at 362, 628 S.E.2d at 913.

"Words of a restrictive covenant will be given the common, ordinary meaning attributed to them at the time of their execution." *Taylor v. Lindsey*, 332 S.C. 1, 4, 498 S.E.2d 862, 863 (1998). "[T]he paramount rule of construction is to ascertain and give effect to the intent of the parties as determined from the whole document." *Id.* at 4, 498 S.E.2d at 863–64 (quotation marks omitted). When "the language imposing restrictions upon the use of property is unambiguous, the restrictions will be enforced according to their obvious meaning." *Shipyard Prop. Owners' Ass'n v. Mangiaracina*, 307 S.C. 299, 308, 414 S.E.2d 795, 801 (Ct.App.1992). "A restriction on the use of property must be created in express

terms or by plain and unmistakable implication, and all such restrictions are to be strictly construed, with all doubts resolved in favor of the free use of property." *Taylor*, 332 S.C. at 5, 498 S.E.2d at 864 (citation and quotation marks omitted). However, this rule of strict construction " 'should not be applied so as to defeat the plain and obvious purpose of the instrument.' " *McClellanville*, 345 S.C. at 622, 550 S.E.2d at 302 (quoting *Taylor*, 332 S.C. at 4–5, 498 S.E.2d at 863–64).

 Likewise, in construing a deed,

the intention of the grantor must be ascertained and effectuated, unless that intention contravenes some well settled rule of law or public policy. In determining the grantor's intent, the deed must be construed as a whole and effect given to every part if it can be done consistently with the law. The intention of the grantor must be found within the four corners of the deed.

*Windham v. Riddle*, 381 S.C. 192, 201, 672 S.E.2d 578, 582–83 (2009) (citations and quotation marks omitted).

 Here, the subdivision's Restrictive Covenants, deeds, and plats clearly and unambiguously show Developers' intent to include Tract L in the subdivision and to subject Tract L to the subdivision's Restrictive Covenants. A brief history of the subdivision follows.

On September 8, 1997, Developers executed the Restrictive Covenants for Senrab Farms. The Restrictive Covenants state, in pertinent part:

KNOW ALL MEN BY THESE PRESENTS, that James M. Barnes and Delete [sic] B. Barnes (hereinafter referred to as "Declarant"), the owners of the property described herein **or made subject hereto from time to time,** hereby covenant and agree ... with persons who shall hereafter purchase the property described in the attached Exhibit A, as follows:

1. Whenever used herein, the term "Lots" shall refer to lots which are subject hereto, whether by specific reference in this instrument, or to **lots made subject to the provisions of this instrument by separate legal instrument recorded in the Dorchester County RMC Office.**

. . .

(emphases added).

Exhibit A to the Restrictive Covenants references a plat dated July 5, 1997 and entitled "Plat Showing Eleven Lots of Senrab Farms[,] A Subdivision Owned by James M. Barnes and Delene Barnes." Exhibit A also designated the lots subject to the Restrictive Covenants at that point in time as lots D, E, F, G, H, and I.[4] From September 8, 1997 through January 21, 1998, Developers conveyed these lots to several couples, respectively, including Owner and his wife, who purchased Lot F. During this time period, the majority of lot owners gave written consent to amend the Restrictive Covenants concerning the type of fencing allowed. Owner later purchased the adjoining Lot G from the initial purchasers.

On February 25, 1998, Developers executed a document entitled "Amendment to Restrictions" in anticipation of their conveyance of Tract L to a builder hired by Neighbors to construct a home on the property. On this same date, Developers conveyed Tract L to the builder, Steve Hill/Habersham Builders, Inc. (Hill), and on December 23, 1998, Hill conveyed Tract L to Neighbors. As we will explain in section III of this opinion, the Amendment to Restrictions was likely invalid. In any event, this document sought to allow Hill to subdivide Tract L and to allow Hill and his successors to keep up to six horses on the property. The document also included the following language: "EXCEPT AS HEREINABOVE MODI-FIED AND SET OUT, and by acceptance hereof, under-signed do hereby agree and consent that the property shall be restricted in accordance with the restrictive covenants, dated September 8, 1997 and recorded in the RMC Office for Dorchester County in Book 1821, Page 331."

In this document, Developers confirmed their intent to include Tract L in the subdivision by (1) the title of the document itself, i.e., "Amendment to Restrictions;" (2) limiting the use of the property to single-family residential; and (3) designating the property in Exhibit A as "Tract L, Senrab Farms."

---

4. The record does not indicate when, or if, Developers sold lots A through C. Likewise, the record does not indicate what, if any, restrictions were placed on those lots.

Further, the deeds to Hill and to Neighbors pair the designation "Tract L" with the subdivision's name, i.e., "Tract L, Senrab Farms." These deeds also reference the Restrictive Covenants, which clearly contemplated the growth of the subdivision beyond the six lots that were specifically referenced. The deeds to Hill and to Neighbors also reference the three subdivision plats, dated July 5, 1997, December 29, 1997, and May 5, 1998, respectively. These plats are consistent with the position that Tract L was already contemplated as part of the subdivision's general plan of development in phases. Notably, the July 5, 1997 plat designates what later became Tract L and Tract M as "14.19 acres Residual." The use of the term "residual" indicates that Developers viewed this property as the undesignated remainder of some defined quantity, that quantity being all of the subdivision property.[5]

The July 5, 1997 plat also designates the lots by consecutive lettering, i.e., lots "A" through "K," which is continued with Tract "L" and Tract "M" in the plat dated December 29, 1997 and with Tracts "M" through "Q" in the plat dated May 5, 1998. Consecutive lettering has been noted in at least one South Carolina case as evidence of a single scheme of development. *See Slear v. Hanna,* 329 S.C. 407, 409–11, 496 S.E.2d 633, 634–35 (1998) (holding there was evidence to support the special referee's finding that a developer intended to dedicate an access point to the Intracoastal Waterway to all property owners in a development, which in turn was based on the referee's findings that (1) the development consisted of Blocks A through O, as depicted on the tax map, and (2) the consecutive lettering of the blocks evidenced a single scheme of development).

In sum, the Restrictive Covenants, deeds, and plats clearly and unambiguously show Developers' intent to maintain a residential neighborhood and to exclude commercial activities from the neighborhood. *Cf. Easterly v. Hall,* 256 S.C. 336, 343–44, 182 S.E.2d 671, 674 (1971) (reviewing deeds, plats and protective covenants and holding that all conveyances made by the common grantor "manifested a definite plan and purpose to develop her subdivision as a residential neighborhood").

---

5. "Residual," when used as a noun, is defined as "[a] leftover quantity; a remainder." *Black's Law Dictionary* 1424 (9th ed.2009).

Neighbors, however, insist that to add property to Senrab Farms beyond the six lots referenced in Exhibit A to the Restrictive Covenants, Developers were required to execute an amendment to the Restrictive Covenants. Neighbors further argue that Developers did not follow the required amendment procedure to subject Tract L to the Restrictive Covenants when they conveyed Tract L to Hill. In support of this argument, Neighbors cite paragraph 18 of the Restrictive Covenants, which states that an amendment of the Restrictive Covenants must be implemented by the written consent of a majority of the owners of lots subject to the Restrictive Covenants. By the time Developers conveyed Tract L to Hill, they had sold the six lots that were originally subject to them. Hence, Neighbors argue that because Developers did not obtain the consent of a majority of the new lot owners, Developers could not amend the Restrictive Covenants to make Tract L subject to the Restrictive Covenants. Neighbors also cite *Queen's Grant*, 368 S.C. at 362–63, 628 S.E.2d at 913–14, for the proposition that when a developer fails to expressly reserve a right to amend the covenants, amendments are not allowed.

Neighbors conflate the concept of subjecting additional property to the Restrictive Covenants with amending the actual content of the Restrictive Covenants' **terms.** The terms of the original Restrictive Covenants already provided for additional subdivision property to be subjected to them by **any** separate legal instrument, such as the deed from Developers to Hill, and, hence, those terms did not need to be amended for them to govern the additional property. The deed to Hill subjected Tract L to the Restrictive Covenants and brought Tract L within the definition of "Lots" set forth in the Restrictive Covenants by including the following language within the property description: "SUBJECT TO: Restrictive Covenants dated September 8, 1997 . . . Amendment to restrictions dated February 25, 1998 . . . Amendment to restrictions dated November 25, 1997. . . ." Likewise, the deed conveying Tract L to Neighbors included similar language within the property description: "SUBJECT TO: Restrictive Covenants and amendments thereto. . . .".

Based on the foregoing, the master erred in ruling that Neighbors' Tract B was not subject to the original Restrictive Covenants.

## II. Standing

■ Owner argues the master erred in finding that Owner lacked privity of contract or standing to enforce the Restrictive Covenants. We agree.

In her order, the master stated that to add property beyond the six lots referenced in Exhibit A to the Restrictive Covenants, Developers were required to amend the Restrictive Covenants. The master also stated that Developers did not follow the required amendment procedure to subject Tract L to the Restrictive Covenants when they conveyed Tract L to Hill. The master ruled that Developers did not lawfully amend the Restrictive Covenants to make Tract L subject to them and, hence, the restrictions in the Amendment to Restrictions were in fact original restrictions on Tract L. She then concluded that there was no covenant relationship between Neighbors and Owner.

Similarly, Neighbors argue that even if Developers effectively subjected Tract L to the Restrictive Covenants, the fact that Developers "used the same Restrictive Covenants on two (2) distinct properties [Owner's property and Neighbors' property] does not necessarily place the properties and their owners in a covenant relationship." Neighbors base this argument on their assertion that their property was never part of the Senrab Farms subdivision and, thus, there was no contractual agreement between Owner and Neighbors.

"Restrictive covenants differ from contracts in that they 'run with the land,' meaning that they are enforceable **by** and against **later grantees.**" *Queen's Grant,* 368 S.C. at 361, 628 S.E.2d at 913 (emphases added); *cf. Bomar v. Echols,* 270 S.C. 676, 679, 244 S.E.2d 308, 310 (1978) (explaining restrictive covenants arising by implication and stating, "where the owner of a tract of land subdivides it and sells the distinct parcels thereto to separate grantees, imposing restrictions on its use pursuant to a general plan of development or improvement, such restrictions may be enforced by any grantee against any other grantee"). As expressed in section I of this opinion,

Developers intended for Neighbors' property to be part of Senrab Farms subdivision, and Developers expressed that intention in the Restrictive Covenants, deeds, and plats affecting the property. Therefore, the master erred in concluding that Owner did not have privity of contract or standing to enforce the Restrictive Covenants against Neighbors. *See Windham*, 381 S.C. at 201, 672 S.E.2d at 582 (holding that in construing a deed, the intention of the grantor must be ascertained and effectuated, unless that intention contravenes some well-settled rule of law or public policy); *Taylor*, 332 S.C. at 4, 498 S.E.2d at 863–64 (holding that the paramount rule of construction of a restrictive covenant is to ascertain and give effect to the intent of the parties as determined from the whole document).

## III. Validity of Amendment as Original Restrictions

Owner contends the master erred in concluding that the restrictions set forth in the "Amendment to Restrictions" were original restrictions on Neighbors' property. We agree.

### A. Law of the case

Initially, we address Neighbors' contention that Judge Dickson's December 20, 2011 order upheld the applicability of the Amendment to Restrictions to Neighbors' property and, because Owner did not appeal that ruling, he is now barred from raising this issue. *See Shirley's Iron Works, Inc. v. City of Union*, 403 S.C. 560, 573, 743 S.E.2d 778, 785 (2013) ("An unappealed ruling is the law of the case and requires affirmance."). We disagree for two reasons. First, we do not interpret Judge Dickson's ruling as having upheld the applicability of the Amendment to Restrictions. Rather, his order as a whole indicates that he found this to be a question for trial. The master also interpreted Judge Dickson's order as leaving the issue of the applicability of the Amendment to Restrictions to be determined at trial.

Second, Owner first challenged the applicability of the Amendment to Restrictions in his summary judgment motion, and Judge Dickson's reference to this issue was made in an order denying Owner's summary judgment motion, which is never appealable. *See Olson v. Faculty House of Carolina*,

*Inc.,* 354 S.C. 161, 168, 580 S.E.2d 440, 444 (2003) ("[T]he denial of a motion for summary judgment is not appealable, even after final judgment.").

Based on the foregoing, Owner is not barred from assigning error to the master's conclusion that the Amendment to Restrictions applied to Neighbors' property as original restrictions.

### B. Merits

Although the master acknowledged the definition of "Lots" in the original Restrictive Covenants,[6] she concluded that Developers never executed a separate legal instrument bringing additional property within the Restrictive Covenants. The master based this conclusion on the theory that Developers had to amend the Restrictive Covenants before the covenants could apply to additional property. However, the terms of the Restrictive Covenants **already** provided for additional subdivision property to be subjected to them whenever Developers executed **any** legal instrument, such as a deed, that, by its terms, made a lot subject to the Restrictive Covenants. Hence, the Restrictive Covenants' terms did not need to be amended *in order for them to govern the additional property.*

Further, the deeds to Hill and to Neighbors clearly required Tract L to be subject to the original Restrictive Covenants and valid amendments to those covenants. Yet, because the Amendment to Restrictions was not lawfully executed according to the terms of the Restrictive Covenants, i.e., by a majority of owners of lots subjected to the Restrictive Covenants, the plain language of the deeds to Hill and to Neighbors required the property to be subject to only the terms of the original Restrictive Covenants and the November 25, 1997 amendment concerning fencing. *See Brown v. Bass,* 276 S.C. 211, 213, 277 S.E.2d 480, 480 (1981), cited in 17 S.C. Jur. *Covenants* § 68 (affirming the trial court's order finding invalid an attempt to amend a restrictive covenant prohibiting

---

6. This definition states: "Whenever used herein, the term "Lots" shall refer to lots which are subject hereto, whether by specific reference in this instrument, or to lots made subject to the provisions of this instrument by separate legal instrument recorded in the Dorchester County RMC Office."

trailers on lots and ordering a trailer removed from a restricted lot; plaintiff was entitled to have the disputed petition declared an ineffective amendment and to enforce the original covenant forbidding trailers).[7]

Based on the foregoing, the master erred in concluding that the restrictions in the Amendment to Restrictions were original restrictions on Neighbors' property.

## IV. Compliance with Covenants

██ Owner maintains the master erred in finding that Neighbors used their Tract B as their yard and that they lived there. Owner also argues the master erred in declaring that Neighbors' use of Tract B complied with the restrictions regarding residential use and the number of horses allowed on the property. We agree.

Paragraph five of the Restrictive Covenants prohibits any use other than single–family residential use.[8]

"Single-family residential use" involves the act of residing in a single-family dwelling. *See Easterly*, 256 S.C. at 342–44, 182 S.E.2d at 674 (interpreting a restriction providing that no structure "shall be erected upon any of [the] residential lots other than one single family private *dwelling house*" and stating, "No apartment house or duplex of any type shall be erected or maintained on any of the lots" and holding that the general plan of the *residential* neighborhood had been main-

---

7. *See also Hynes Family Trust v. Spitz*, 384 S.C. 625, 629, 682 S.E.2d 831, 833 (Ct.App.2009) ("Restrictive covenants are construed like contracts.... If a contract's language is clear and capable of legal construction, this [c]ourt's function is to interpret its lawful meaning and the intent of the parties as found in the agreement." (citations and quotation marks omitted)); *id.* ("A clear and explicit contract must be construed according to the terms the parties have used, with the terms to be taken and understood in their plain, ordinary, and popular sense." (citation and quotation marks omitted)).

8. Even the invalid Amendment to Restrictions explicitly prohibited any use of Tract L other than as a single-family residential building tract. The document also conditioned the subdivision of Tract L on the use of the subdivided tracts being residential. Although this instrument purported to allow Hill, and ultimately Neighbors, to keep six horses, one two-story detached barn, and certain farm equipment, there is nothing to indicate that these modifications were meant to convert the permitted use from residential to commercial.

tained since its inception because only single family dwellings had been erected on the lots (emphases added)); *Maxwell v. Smith,* 228 S.C. 182, 193–94, 89 S.E.2d 280, 285 (1955) (interpreting a covenant restricting use of lots to "residential purposes" and stating that a lake stocked with minnows and pools holding minnows for ultimate sale in a nearby city were elements of a commercial installation in violation of the covenant); *id.* at 194–95, 89 S.E.2d at 286 (holding that even if the commercial use stopped, the lake and pools were on vacant lots and, therefore, must be viewed as "not incident to residential use").

In her December 6, 2012 order, the master stated that Tract B was "akin to [Neighbors'] yard of their residence." The master also stated "[t]he fact that the actual residence does not occupy both lots does not mean that [Neighbors] are not using their property for residential purposes. They live there." As to her conclusion in her September 28, 2012 order that Neighbors' leasing of Tract B did not violate the residential use requirement, the master reasoned that the requirement for single-family residential use "does not prohibit the leasing of real property or having horses on that leased real property." She further stated "there is nothing in the restrictions requiring that those six (6) horses belong to [Neighbors]." The master also cited paragraph 13(j) of the Restrictive Covenants, which allows "For Rent" signs on lots, to support her reasoning.[9] She went on to state "There is no . . . restriction in the Amendment to Restrictions or the original Restrictive Covenants that prohibits leasing the property to a third party who places horses on the property."

Likewise, Neighbors argue that paragraph 13(j) of the Restrictive Covenants recognizes that property subjected to the Restrictive Covenants can be "leased." Assuming the accuracy of this argument, it does not negate the residential **use** requirement. In other words, even if subdivision property is properly leased to a third party, the lease must not permit the lessee to use the property for a commercial venture or for any purpose other than residential housing.

---

9. Paragraph 13(j) states: "The only signs permitted on the lots are those reading "For Sale" or "For Rent", or appropriate signs of the building contractor during the period of construction. . . ."

There is no question that Neighbors leased all of their Tract B to the operators of "Senrab Equestrian Center" for the purpose of using Tract B as a horse pasture to enhance their equestrian business. Therefore, Neighbors' Tract B was not used for residential purposes; rather, it was used for a commercial venture. At trial, one of the Neighbors, Douglas Richardson, admitted under cross-examination that he was not using Tract B for residential purposes. Further, during oral arguments, Neighbors conceded that leasing real property for commercial purposes is different from leasing for the purpose of inhabiting a dwelling.

Based on the foregoing, the master erred in finding that Neighbors used Tract B as their yard and "lived there," and in declaring that Neighbors' use of Tract B complied with the restrictions regarding residential use and the number of horses allowed on the property.

## V. Balancing of the Equities

Owner argues that the equities in this case require Neighbors' current use of their Tract B to be enjoined. We agree.

■■ Because an action seeking an injunction to enforce restrictive covenants sounds in equity, upon a finding that a restriction has been violated, a court may not enforce the restriction **as a matter of law** but must consider equitable doctrines asserted by a party when deciding whether to enforce the covenant. *Matsell v. Crowfield Plantation Cmty. Servs. Ass'n, Inc.,* 393 S.C. 65, 71, 710 S.E.2d 90, 93–94 (Ct.App.2011) (emphasis added). The equities in the present case require Neighbors' leasing of Tract B for horse grazing to be permanently enjoined.

In *Buffington v. T.O.E. Enterprises,* 383 S.C. 388, 680 S.E.2d 289 (2009), our supreme court reviewed an order enjoining the operators of a Toyota dealership from using their property across from the dealership, and within a subdivision, for commercial purposes. Certain lots within the subdivision, including the property owned by the dealership operators, were subject to a restrictive covenant limiting their use to residential purposes. 383 S.C. at 390–91, 680 S.E.2d at 290. In examining the equities relating to enforcement of the covenant, the court concluded that it would be inequitable to

consider the dealership operators' financial loss in purchasing and improving their land because they were on notice of the subdivision restriction prohibiting any use other than residential when they purchased the land. 383 S.C. at 393, 680 S.E.2d at 291. The court also concluded that to ignore the restriction, in the absence of evidence to support lifting the restriction based on equitable doctrines, would "eliminate a homeowner's justified reliance on property restrictions." 383 S.C. at 393–94, 680 S.E.2d at 291–92.

Like the dealership operators in *Buffington*, when Neighbors purchased Tract L, they were on notice of the requirement that the use of Tract L must be residential. As to the attempt to amend the original Restrictive Covenants to allow Neighbors to have six horses on their property, they were on notice of the provision in the original Restrictive Covenants requiring the vote of a majority of the owners of property subject to the Restrictive Covenants to legally amend the Restrictive Covenants.

Further, we see nothing in the record to support a deviation from the restriction regarding residential use. Neighbors argue that when Owner purchased his property, there were already horses that lived in the barn and grazed on the "fourteen (14) residual acres" and, thus, "[i]t is disingenuous for [Owner] to attempt to argue that he had the right to assume that the property eventually conveyed to [Neighbors] was restricted to prohibit horses or somehow limit those horses to one (1) horse for the entire fourteen (14) acres." However, there is nothing in the record to indicate that when Owner purchased his property in January 1998, there was the extent of customer traffic and its accompanying nuisances that occurred years later.

In fact, the covenants governing the property eventually purchased by the Nguyens in 2003 prohibited any commercial use of that property, and the covenants expressly stated that they were burdening the property for the benefit of the remainder of Developers' 49.7 acre parcel, which included the residential lots in Senrab Farms subdivision. These covenants were recorded in the RMC office on October 8, 1992. Therefore, Owner had a right to rely on these covenants in making his purchasing decision. The mere presence of horses

in the area when Owner purchased his property was consistent with the agricultural use permitted on the property eventually purchased by the Nguyens (and not yet prohibited on the property eventually purchased by Neighbors). The mere presence of horses would not have necessarily placed Owner on notice that these properties were being used for a commercial venture.

Neighbors also argue that Owner's settlement with the Nguyens allowing up to ten horses on their property shows that Owner is not negatively affected by Neighbors' use of their Tract B. However, the settlement expressly prohibits the use of the Nguyens' property for any commercial purpose other than boarding horses at the barn. Further, the record shows that if the court prohibits any commercial use of Neighbors' Tract B, it will eliminate the extra grazing land available to Senrab Equestrian Center, which will, in turn, eliminate the center's attractiveness to its customers—Douglas Richardson testified that his leasing of Tract B for horse grazing helped facilitate customer traffic by making the center more appealing to horse owners.

Moreover, Owner testified that he agreed to the allowance of up to ten horses on the Nguyens' property because he did not think the Nguyens could fit that many horses on their one acre of grazing land. Therefore, despite the master's finding to the contrary, this court may find that Owner's settlement agreement with the Nguyens did not diminish the credibility of his claim that Neighbors' leasing of Tract B for horse grazing has adversely affected Owner's quality of life.[10] *See*

---

10. The master's credibility finding was based on her incorrect assumption that the settlement would allow Senrab Equestrian Center to continue all of its commercial uses of the Nguyens' property rather than just boarding: "[Owner] settled with the equestrian center ... to allow keeping up to ten horses on the property. An active equestrian center would certainly have a greater impact on traffic and activity in the neighborhood[] than [Neighbors] ... allowing six horses to graze." Therefore, we do not believe it is appropriate to give deference to this credibility finding despite the statement in prior case law that an appellate court is not required to ignore the fact that the master was in a better position to assess the credibility of the witnesses. *See Santoro v. Schulthess*, 384 S.C. 250, 261, 681 S.E.2d 897, 902 (Ct.App.2009) ("[T]his broad scope of review does not require this Court to disregard the findings at trial or ignore the fact that the master was in a better position to assess the credibility of the witnesses.").

*McClellanville,* 345 S.C. at 622, 550 S.E.2d at 302 (holding that an action seeking an injunction to enforce restrictive covenants sounds in equity and, therefore, this Court may make findings according to its own view of the preponderance of the evidence).

Based on the foregoing, the master erred in failing to balance the equities. The master also erred in finding that Owner's settlement with the Nguyens will allow a greater impact on traffic and activity in the neighborhood than Neighbors' leasing of their property for horse grazing.

## CONCLUSION

Accordingly, we **REVERSE** the master's September 28, 2012 and December 7, 2012 orders and **REMAND** for entry of an order permanently enjoining Neighbors from leasing their property in Senrab Farms for any purpose other than residential housing.

HUFF and LOCKEMY, JJ., concur.