# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Town of Sullivan's Island, Respondent,

v.

Nathan Bluestein and Theodore Albenesius, III,
Appellants.

Appellate Case No. 2023-001082

---

Appeal from Charleston County
Jennifer B. McCoy, Circuit Court Judge

---

Opinion No. 6139
Heard October 8, 2025 – Filed February 25, 2026

---

**AFFIRMED**

---

James Bernard Hood and Virginia Rogers Floyd, both of
Hood Law Firm, LLC, of Charleston; Lisa Brennan Bisso,
of Charleston; and Deborah Harrison Sheffield, of
Columbia, all for Appellants.

Alexandra Harrington Austin, of Nexsen Pruet, LLC, of
Charleston; Clarence Ross Turner, IV, of The Turner
Agency Inc., of Greenville; and William W. Wilkins, of
Billy Wilkins Law, LLC, of Greenville, all for
Respondent.

---

**GEATHERS, J.:**  This case arises out of a declaratory judgment action brought by Respondent Town of Sullivan's Island (the Town) against Appellants Nathan Bluestein and Theodore Albenesius, III (collectively, Property Owners).  Property Owners appeal the circuit court's order granting summary judgment in favor of the Town, arguing the circuit court erred by (1) finding the settlement agreement between the parties was invalid and unenforceable because it involved the Town's legislative functions or governmental powers; (2) finding the settlement agreement was otherwise unreasonable as a matter of law because of its perpetual duration; (3) refusing to enforce the settlement agreement's severability clause; and (4) refusing to reinstate Property Owners' initial action against the Town after invalidating the settlement agreement.  We affirm.

## FACTS AND PROCEDURAL HISTORY

The Town is the fee simple owner of accreted land[1] located along the Atlantic Ocean on Sullivan's Island.  Property Owners purchased property in the Town that abuts the accreted land.  The settlement agreement that is the focus of our analysis arose from Property Owners' initial action concerning the Town's maintenance obligations under the deed for the accreted land.

The deed for the accreted land includes the following restrictive covenants:

> 1. Except as otherwise provided or permitted in Paragraphs 2 and 3 hereof, the [accreted land] shall remain in its natural state, no changes shall be made to its topography or vegetation[,] and no structures or improvements shall be erected on the [accreted land].
>
> 2. Notwithstanding the provisions of Paragraphs 1 and 3 and subject to the limitations of Paragraph 4, the Town Council is given the unrestricted authority to trim and control the growth of vegetation for the purposes of mosquito control, scenic enhancement, public and

---

[1] Accreted land is land that has gradually increased in size due to the deposit of sand, soil, or other materials caused by movement of water sources, such as rivers, lakes, or the sea.  *See Accretion*, *Black's Law Dictionary* (11th ed. 2021).

emergency access to the Atlantic Ocean[,] and providing views of the ocean and beaches to its citizens.

3. Notwithstanding the provisions of Paragraph 1 hereof, and subject to the limitations of this Paragraph 3 and of Paragraph[] 2 . . . *the Town . . . shall have the right to improve, change, modify[,] or alter the [accreted land] only if such actions are to further or effect one or more . . . enumerated public objectives or policies ("Public Policies") . . . .*

(emphasis added). Under the restrictions of paragraph 3, should the Town choose to trim or remove vegetation on the accreted land, it must do so in furtherance of at least one of the following Public Policies: (1) drainage; (2) mosquito control; (3) maintenance of public walkways and emergency access to the Atlantic Ocean; (4) beach renourishment; (5) erosion control; (6) vegetation management; (7) educational programs; (8) public safety; (9) public health; and (10) scenic enhancement.

Furthermore, for the Town to take any action permitted under paragraph 3, the deed requires the Town council to make the following findings of fact in writing: (1) the proposed public action is solely for the purpose of furthering one or more of the Public Polices; (2) the proposed public action is necessary for the Town's health, safety, or general welfare; (3) the benefits of the action outweigh any damage done to the accreted land's value in its natural state; and (4) in making the prior findings of fact, the Town considered the cumulative effect of the action, alternative methods, and probable results of not taking the action. Additionally, the deed gives property owners in the Town authority to "seek any appropriate remedy for any violation [of the deed's restrictions], including, but not limited to, injunctive relief to force a termination of the violation or to permit restoration of the area damaged by a[] prohibited activity."

In July 2010, Property Owners brought several causes of action against the Town, including a declaratory judgment action to determine how the Town must maintain the accreted land's vegetation to comply with the deed. The master-in-equity granted summary judgment in favor of the Town as to all claims, and this court affirmed the master's order. *See Bluestein v. Town of Sullivan's Island*, 424 S.C. 362, 818 S.E.2d 239 (Ct. App. 2018). Our supreme court

reversed—finding that genuine issues of material fact existed as to the Town's maintenance responsibilities of the accreted land and that such responsibilities under the deed were ambiguous—and remanded the case for further proceedings. *See Bluestein v. Town of Sullivan's Island*, 429 S.C. 458, 839 S.E.2d 879 (2020).

Following remand, Property Owners and the Town negotiated a settlement agreement, and the Town's council members passed a resolution authorizing the agreement. The resolution's findings of fact, which were incorporated into the settlement agreement, provided that "[t]he settlement, and implementing steps associated therewith, [were] solely undertaken to further specific enumerated, permissible public purposes under the [d]eed" and were "necessary for the health, safety, and general welfare of the Town." On October 7, 2020, the parties executed the settlement agreement.

As part of the settlement agreement, the Town agreed to implement a "selective thinning" plan consisting of the removal and trimming of vegetation on the accreted land. The selective thinning plan involves two components: (1) initial trimming of the accreted land (the Initial Trimming Component); and (2) subsequent and recurring review or maintenance of the accreted land and its vegetation (the Recurring Review Component).

For the Initial Trimming Component, the settlement agreement requires the Town to provide part of the funding, and the remainder of the funding is "subject to receipt of adequate donations or grants," which may include funding from Property Owners and neighboring homeowners. The agreement directs the Town to begin trimming or removing vegetation on designated portions of the accreted land once it receives sufficient funds and gives the homeowners twelve months from the date of the settlement agreement to provide sufficient funds to the Town.[2]

For the Recurring Review Component, the settlement agreement provides the following:

> *In order to maintain similar conditions going forward, with the help of a naturalist the Town would review changes in the condition of the [accreted land] on a*

---

[2] The parties later amended the settlement agreement for the twelve-month period to commence once "the Town receive[d] necessary regulatory approvals."

*recurring basis* (for instance, once every five years) with an eye toward[] making whatever changes might be necessary to maintain appropriate levels of density and diversity.

(emphasis added).  The parties stipulated that the settlement agreement could not be "modified or amended, nor [could] any of its provisions be waived, *except upon mutual agreement of all [p]arties* or their authorized agents in writing." (emphasis added).  Furthermore, the settlement agreement provides that it would be "binding upon and inure to the benefit of all the parties, and their heirs, successors[,] and assigns."

After the parties executed the settlement agreement, the circuit court approved it, finding that it was proper and "in the best interests of all [p]arties."  The parties later sought approval to amend the agreement,[3] and the circuit court issued an order approving the amendment on April 12, 2021.

On or about May 4, 2021, the Town elected a new town council.  On February 21, 2022, the Town brought a declaratory judgment action against Property Owners, seeking an order that the settlement agreement was invalid and unenforceable.  The Town moved for summary judgment, which the circuit court granted.

In granting summary judgment, the circuit court found the following:

[T]he [s]ettlement [a]greement is invalid and unenforceable as a matter of law because it involves the legislative/governmental powers of the Town and purports to bind the current and future town councils.  However, even if the settlement agreement could somehow be said

---

[3] The parties intended the amendment to address "anticipated third-party regulatory concerns," "further the spirit of the original settlement agreement," and describe the work plan "with enough clarity and in enough detail to allow [f]ederal and [s]tate agencies with permitting authority to determine if the proposed activities [would] require a permit."  The amendment added a more detailed scope of work for the accreted land and provided that "[t]he [p]arties' statements of general intent, goals, and desire to balance various interests as described in the original [s]ettlement [a]greement [were to] remain valid."

to involve only proprietary/business functions, it is still invalid and unenforceable because it is unreasonable as a matter of law.

To support the finding that the settlement agreement was unreasonable as a matter of law, the circuit court concluded that the agreement's provision requiring that the Town "maintain similar conditions going forward," as well as the provisions on the agreement's binding effect and modification requirements, imposed obligations on the Town for a perpetual duration, which was unreasonable and against public policy.

The circuit court also found that the material terms of the settlement agreement (specifically, the selective thinning plan and the provision requiring the Town to "maintain similar conditions going forward") were so interdependent that they could not be severed without depriving the agreement of any meaningful substance or effect.

Property Owners filed a motion to alter or amend, and the circuit court denied the motion. This appeal followed.

## ISSUES ON APPEAL

I.     Whether the circuit court erred by finding the settlement agreement was invalid and unenforceable because it involved the Town's legislative functions or governmental powers.

II.     Whether the circuit court erred by finding the settlement agreement was unreasonable as a matter of law because of its perpetual duration.

III.     Whether the circuit court erred by refusing to enforce the settlement agreement's severability clause.

IV.     Whether the circuit court erred by not reinstating Property Owners' initial action after invalidating the settlement agreement.

## STANDARD OF REVIEW

"Declaratory judgments in and of themselves are neither legal nor equitable. The standard of review for a declaratory judgment action is therefore determined by the nature of the underlying issue." *Kinard v. Richardson*, 407 S.C. 247, 256, 754 S.E.2d 888, 893 (Ct. App. 2014) (citation omitted) (quoting *Campbell v. Marion Cnty. Hosp. Dist.*, 354 S.C. 274, 279, 580 S.E.2d 163, 165 (Ct. App. 2003)).

"In South Carolina jurisprudence, settlement agreements are viewed as contracts." *Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 241, 672 S.E.2d 799, 802 (Ct. App. 2009). "An action to construe a contract is an action at law reviewable under an 'any evidence' standard." *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). "Whether a contract is against public policy or is otherwise illegal or unenforceable is generally a question of law for the court." *Palmetto Mortuary Transp., Inc. v. Knight Sys., Inc.*, 424 S.C. 444, 452, 818 S.E.2d 724, 729 (2018) (quoting *Milliken & Co. v. Morin*, 399 S.C. 23, 30, 731 S.E.2d 288, 291 (2012)); 17B C.J.S. *Contracts* § 1031 (2025). This court reviews questions of law de novo. *See Palmetto Mortuary*, 424 S.C. at 452, 818 S.E.2d at 729.

This court reviews the grant of a summary judgment motion under the same standard applied by the trial court pursuant to Rule 56(c), SCRCP. *See Jackson v. Bermuda Sands, Inc.*, 383 S.C. 11, 14 n.2, 677 S.E.2d 612, 614 n.2 (Ct. App. 2009). Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), SCRCP. "At the summary judgment stage of litigation, the court does not weigh conflicting evidence with respect to a disputed material fact." *S.C. Prop. & Cas. Guar. Ass'n v. Yensen*, 345 S.C. 512, 518, 548 S.E.2d 880, 883 (Ct. App. 2001). Rather, "[t]he purpose of summary judgment is to expedite the disposition of cases not requiring the services of a fact finder." *John Deere Constr. & Forestry Co. v. N. Edisto Logging, Inc.*, 443 S.C. 424, 434, 904 S.E.2d 889, 894 (Ct. App. 2024).

"[A]n adverse party may not rely on the mere allegations in [the] pleadings to withstand a summary judgment motion[] but must set forth specific facts showing there is a genuine issue [of material fact] for trial." *Strickland v. Madden*, 323 S.C. 63, 68, 448 S.E.2d 581, 584 (Ct. App. 1994). "In determining whether any triable issues of fact exist, the evidence and all inferences which can be reasonably drawn

from the evidence must be viewed in the light most favorable to the nonmoving party." *Moore v. Weinberg*, 383 S.C. 583, 588, 681 S.E.2d 875, 878 (2009).

## LAW AND ANALYSIS

Property Owners argue the circuit court erred by invalidating the settlement agreement because the subject matter of the agreement involves the Town's business or proprietary functions and, thus, could bind the current and future town councils. We disagree.

There is a "public interest in the finality of settlement agreements," *Condon v. State*, 354 S.C. 634, 642, 583 S.E.2d 430, 434 (2003), but we still must view this settlement agreement as a contract between the Town and Property Owners. *See Pee Dee Stores*, 381 S.C. at 241, 672 S.E.2d at 802 ("In South Carolina jurisprudence, settlement agreements are viewed as contracts."). As such, if the subject matter of the settlement agreement entered into by the prior town council involves the Town's legislative functions or governmental powers, the agreement cannot bind the current and future town councils.

> *If the term of the contract in question extends beyond the term of the governing members of the municipality entering into the contract, the validity of the contract is dependent on the subject matter of the contract.* The general rule is that, if the contract involves the exercise of the municipal corporation's business or proprietary powers, the contract may extend beyond the term of the contracting body and is binding on successor bodies if, at the time the contract was entered into, it was fair and reasonable and necessary or advantageous to the municipality. However, *if the contract involves the legislative functions or governmental powers of the municipal corporation, the contract is not binding on successor boards or councils.*

*Piedmont Pub. Serv. Dist. v. Cowart* (*Cowart I*), 319 S.C. 124, 132, 459 S.E.2d 876, 880 (Ct. App. 1995) (emphases added), *aff'd*, 324 S.C. 239, 478 S.E.2d 836 (1996); *see also* 10A McQuillin, *The Law of Municipal Corporations*, § 29:103 (3d ed. 2025) ("To the extent that a governmental contract impinges on a municipality's ability to

legislate freely, the contract is ultra vires and void."); 64 C.J.S. *Municipal Corporations* § 1140 (2025) ("Municipal corporations have no authority . . . to make contracts that will embarrass or control them in the performance of their legislative powers and duties."); 56 Am. Jur. 2d *Municipal Corporations, Etc.* § 134 (2025) ("A city board exercising legislative authority lacks the power to bind its successors with regard to governmental functions . . . .  On the other hand, the restriction regarding binding successors does not apply to the exercise of the business powers of a municipal corporation.").

> [W]here the contract involved relates to governmental or legislative functions of the council, or involves a matter of discretion to be exercised by the council[,] unless the statute conferring power to contract clearly authorizes the council to make a contract extending beyond its own term, no power of the council to do so exists, since the power conferred upon municipal councils to exercise legislative or governmental functions is conferred to be exercised as often as may be found needful or politic, and the council presently holding such powers is vested with no discretion to circumscribe or limit or diminish their efficiency, but must transmit them unimpaired to their successors.

*Cowart I*, 319 S.C. at 132, 459 S.E.2d at 880-81 (quoting *Newman v. McCullough*, 212 S.C. 17, 23, 46 S.E.2d 252, 255 (1948)).

> [T]he difference between proprietary and governmental functions is often difficult to determine, because, "[a]s the scope of 'governmentality' expands, the intertwining and overlapping of such functions make it increasingly more difficult to draw any definitive line of separation." However, it is clear the rule is intended to protect the public by insuring that each governing body has available to it the powers necessary to effectively carry out its duties.  Thus, *when determining whether a contract is binding on successor boards, it appears that the "[t]rue test is whether the contract itself deprives a governing body, or its successor, of a discretion which public policy demands should be left unimpaired."*

*Cowart I*, 319 S.C. at 132-33, 459 S.E.2d at 881 (second and third alteration in original) (emphasis added) (first quoting *Valvano v. Bd. of Chosen Freeholders of Union Cnty.*, 183 A.2d 450, 452 (N.J. Super. Ct. App. Div. 1962); then quoting *Plant Food Co. v. City of Charlotte*, 199 S.E. 712, 714 (N.C. 1938)).

Our courts have consistently invalidated contracts that bind future governing bodies because the contracts involved the bodies' legislative functions or governmental powers. *See, e.g.*, *G. Curtis Martin Inv. Tr. v. Clay*, 274 S.C. 608, 612, 266 S.E.2d 82, 84-85 (1980) (holding that sewer service constituted a governmental function of a quasi-municipal sewer district); *City of Beaufort v. Beaufort-Jasper Cnty. Water & Sewer Auth.*, 325 S.C. 174, 179-82, 480 S.E.2d 728, 731-33 (1997) (holding that the power to decide when a special purpose district can provide water to those in its service area was a governmental function of said district); *Cowart I*, 319 S.C. at 133, 459 S.E.2d at 881 (holding that a public service district's decision to employ an administrator and set the terms of the administrator's employment was a governmental function of said district).

In *Clay*, a sewer district entered an agreement in which a private company transferred a privately-owned sewer system to the sewer district; the private company, however, reserved the right to approve or disapprove of the sewer system's connection to large commercial establishments, apartments, townhouses, and condominiums. 274 S.C. at 610, 266 S.E.2d at 83-84. Our supreme court held that, though the sewer district had authority to engage in discretionary contracting, the reservation by the private company was unlawful because the sewer district abdicated its "statutory and constitutional responsibility to act for the public welfare to a private party who has no duty to give the public welfare any deliberation." *Id.* at 612, 266 S.E.2d at 84-85.

In *City of Beaufort*, a water and sewer authority contracted with municipalities to sell water to the municipalities. 325 S.C. at 177, 480 S.E.2d at 730. The contested clauses in the contract at issue prohibited the authority from selling its water for use in Beaufort County without the municipalities' consent. *See id.* Our supreme court determined that the contested clauses deprived the authority of its ability to provide utility services to "persons [the authority] would have the right to serve but for the [c]ontested [c]lauses." *Id.* at 181, 480 S.E.2d at 732. Thus, our supreme court held the contested clauses were an unlawful delegation of governmental power "both because the [c]ontested [c]lauses [bound] future governing boards and, more

importantly, because they g[a]ve away too much power in themselves." *Id.* at 182, 480 S.E.2d at 732-33.

In *Cowart I*, a public service district entered a twenty-year employment contract with the district's administrator. 319 S.C. at 127, 459 S.E.2d at 877. The contract contained a severance clause requiring the district to pay the administrator two years' salary following the district's termination of the administrator's employment, even "in the event of any violation by [the] employee." *Id.* The parties later signed a separate employment agreement encompassing the severance provisions in the original agreement, allowing severance pay for five years. *See id.* at 127, 459 S.E.2d at 877-78. This court held that the employment agreement was void as a matter of public policy because the agreement, in running for twenty years and requiring severance pay for five years even if the administrator breached the agreement, caused "an enormous impairment of the [d]istrict's power and authority" to employ and set terms of employment for the district's administrator, a public official. *Id.* at 133, 459 S.E.2d at 881.

Here, we recognize that the Town has a proprietary interest in the accreted land due to its ownership of and control over the land. *See Proprietary*, *Black's Law Dictionary* (12th ed. 2024) ("[o]f, relating to, or holding as property"). However, unlike an agreement entered into by a private business that is tied to the commercial interests of the business, the settlement agreement's selective thinning plan is not concerned with maintaining the land (nor settling the initial action against the Town) for some financial benefit; it is concerned with maintaining the land *in furtherance of the public health and safety of the general public*. *See Governmental Function*, *Black's Law Dictionary* (12th ed. 2024) (defining a governmental function as conduct by a government agency "that is expressly or impliedly mandated or authorized by constitution, statute, or other law and that is carried out for the benefit of the general public"); 63 C.J.S. *Municipal Corporations* § 875 (2025) (defining a governmental function as "one that benefits the general public and is performed for the common good of all" and a proprietary function as "one intended primarily for the advantage and benefit of persons within the corporate limits of the municipality rather than for use by the general public"); 57 Am. Jur. 2d *Municipal, Etc., Tort Liability* § 44 (2025) ("Governmental functions are public acts that are integral in some way to government while proprietary functions are of a sort in which private persons or businesses might engage for profit."); 56 Am. Jur. 2d *Municipal Corporations, Etc.* § 167 (2025) ("Generally, the principal test for determining whether a function is 'governmental' or 'proprietary' is whether the act performed is

for the common good of all, or whether it is for the special benefit or profit of the corporate entity.").

The Town is statutorily authorized to enact "regulations, resolutions, and ordinances, not inconsistent with the [c]onstitution and general law of this [s]tate . . . which appear[] to it *necessary and proper for the security, general welfare, and convenience of the municipality or for preserving health, peace, order, and good government in it*."[4]  S.C. Code Ann. § 5-7-30 (Supp. 2025) (emphasis added).

Under the authority of section 5-7-30, the Town enacted a resolution that authorized the settlement of the initial action, detailed the selective thinning plan, and provided that both the settlement agreement and the selective thinning plan were "*necessary for the health, safety, and general welfare of the Town*" and were "solely undertaken to further specific enumerated, permissible public purposes under the deed." (emphasis added).  The "enumerated, permissible public purposes" are the Public Policies listed in the deed, which include, but are not limited to, public safety and public health.  The resolution also provided a statement that the benefits of the selective thinning plan outweighed any damage done to the accreted land's value in its natural state and a discussion of the cumulative effect of the plan, alternative methods to the plan, and probable results of not executing the plan.

The Town not only passed the resolution in furtherance of public health and safety under its authority under section 5-7-30, but it also included findings of fact in the resolution that were required under the deed to be made before the Town could

---

[4] Section 5-7-30 and Article VIII of the South Carolina Constitution give the Town authority to enter contracts in furtherance of such regulations, resolutions, and ordinances.  *See* S.C. Const. art. VIII, § 17 ("The provisions of this [c]onstitution and all laws concerning local government shall be liberally construed in their favor. Powers, duties, and responsibilities granted local government subdivisions by this [c]onstitution and by law shall include those fairly implied and not prohibited by this [c]onstitution."); *see also Williams v. Town of Hilton Head Island*, 311 S.C. 417, 422, 429 S.E.2d 802, 805 (1993) (noting that municipalities have constitutional and statutory "authority to enact regulations for government services deemed necessary and proper for . . . preserving health, peace, order[,] and good government," removing the need for additional statutory authorization "so long as such regulations are not inconsistent with the [c]onstitution and general law of the state").

improve, change, modify, or alter the accreted land.  These findings of fact, along with the details of the selective thinning plan, were effectively incorporated into the settlement agreement.

Thus, by passing the resolution with language subsequently incorporated into the settlement agreement, the Town acted both in its statutorily-authorized authority and in furtherance of public health and safety to formalize a plan to maintain the accreted land.  For these reasons, we hold the subject matter of the settlement agreement concerns the Town's governmental function to maintain land it owns in furtherance of public health and safety.[5]  Because our analysis on the subject matter of the settlement agreement above applies to the entire agreement and is dispositive of the second and third issues on appeal, including the severability of the agreement, we need not address those issues.  *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999).  Further, the fourth issue, concerning the reinstatement of Property Owners' initial action against the Town, is not preserved for appeal because Property Owners did not raise this issue to the circuit court.  *See State v. Stahlnecker*, 386 S.C. 609, 617, 690 S.E.2d 565, 570 (2010) ("For an issue to be properly preserved it has to be raised to and ruled on by the trial court.").

---

[5] Additionally, like the contracts in *Clay*, *City of Beaufort*, and *Cowart I*, the settlement agreement impairs, if not expressly delegates, authority the Town has a right to exercise under the constitution and law of this state.  *See Cowart I*, 319 S.C. at 132-33, 459 S.E.2d at 881 (noting the "true test" as to whether a contract is binding on successor boards is "whether the contract itself deprives a governing body, or its successor, of a discretion which public policy demands should be left unimpaired").  Before the settlement agreement, the prior town council could conduct maintenance on the accreted land to improve public health and safety by simply exercising its statutory authority and passing a resolution with findings of fact as required by the deed.  But as a result of this settlement agreement, the decisions of the current or future town councils to alter or stop the selective thinning plan—even if done under the town council's statutorily-authorized authority and in furtherance of public health and safety—would require and be conditioned upon the consent of private individuals, specifically, Property Owners (who have no statutory duty to give public health and safety any deliberation) as the agreement "may not be modified or amended . . . except upon *mutual agreement of all [p]arties* or their authorized agents in writing." (emphasis added).

## CONCLUSION

For the foregoing reasons, the circuit court's grant of summary judgment is

**AFFIRMED.**

**KONDUROS and VINSON, JJ., concur.**